**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **No. 1:21-cr-52-1 (TJK)** |
| **v.** | : | |
| | : | |
| | : | |
| **DOMINIC PEZZOLA,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR MODIFICATION OF BOND TO PLACE THE DEFENDANT ON**
**CONDITIONAL RELEASE PENDING TRIAL**

On January 6, 2021, the defendant, Dominic Pezzola, was one of the first rioters to physically breach the U.S. Capitol, making way for others to enter and endanger the lives and safety of everyone inside, all in a bid to stop the Congress from carrying out its constitutionally mandated duty of certifying the results of the 2020 Electoral College vote. During his approximately 75-minute journey from the exterior of the Capitol grounds to the interior of the building, the defendant placed himself at the front of the crowd as it toppled police barricades and fought with police. Pezzola used the openings made in law-enforcement defenses by his cohorts to advance on the building itself in concert with them. During the course of active clashes between rioters and police, Pezzola robbed an officer of his riot shield, which he then used to break the Capitol window, allowing himself and others to stream into the Capitol.

On February 10, 2021, after conducting a detention hearing and considering parties' written submissions and oral arguments, Magistrate Judge Robin M. Meriweather ordered defendant Dominic Pezzola detained pending trial pursuant to 18 U.S.C. § 3142 because there is clear and convincing evidence that no conditions or combination of conditions of release can assure the

safety of the community.  On February 15, 2021, Magistrate Judge Meriweather issued a Detention Memorandum in support of this order, again finding by clear and convincing evidence that Pezzola poses a danger to the community.  See ECF No. 18 at 2.

On February 18, 2021, the defendant filed a motion for modification of bond, arguing that Magistrate Meriweather's finding was in error and seeking release on conditions that approximate the High Intensity Supervision Program (HISP).  For the reasons set forth below, the United States of America, by and through the U.S. Attorney for the District of Columbia, respectfully urges this Court to deny defendant's motion to reconsider and to order him detained pending trial.

## Procedural Background

On January 15, 2021, the defendant was arrested in Rochester, NY, pursuant to an arrest warrant issued by a magistrate judge in the District of Columbia.  He was presented in the Western District of New York on that same date, and he waived his right to hearings in New York, opting to consent to detention for transport to the District of Columbia.  Pezzola made his initial appearance in this district on January 27, 2021.  At that hearing, the government requested that the defendant be detained pretrial pursuant to 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)(A).  After defendant's original counsel moved to withdraw, the detention hearing was ultimately set with current counsel on February 10, 2021.

On January 29, 2021, the grand jury returned an indictment charging the defendant with violations of 18 U.S.C. §§ 371, 111(a), 231(a)(3), 1361, 1512(c)(2), 1752(a)(1), (2), and (4), and 2112.  The defendant was arraigned on that indictment, along with co-defendant William Pepe, before this Court on February 9, 2021.  The detention hearing took place the following day.  After that hearing, Magistrate Judge Meriweather granted the government's motion for detention and ordered the defendant detained pending trial, which led to the defendant's current motion.

**Factual Background**

The government proffers and incorporates the factual proffer made before Magistrate Judge Meriweather from its initial detention memorandum, which includes the allegations in the affidavit in support of a complaint, as well as oral and written arguments previously made. The government will re-proffer some of those facts below for this Court's convenience in assessing this opposition motion, along with adding some additional facts.

On January 5, 2021, the defendant traveled from Syracuse, New York to Washington, D.C., along with other Proud Boys from New York State.[1] He stayed at a hotel in Washington, D.C. with the people he traveled with, and he was present at a number of Proud Boys rallying points throughout the day on January 6, 2021. The defendant was one of the first people who traversed past toppled police barricades at First Street NW; one of the first who continued past another set of breached barricades near the entrance to a plaza on the west side of the Capitol building; and one of the first up a set of stairs, following a breach of police defenses on those stairs, leading from that plaza to a higher level of the Capitol grounds. He was the first rioter to physically breach the Capitol building well enough to allow others through, and then one of the first to actually enter into the Capitol. He took all of these actions, often acting in concert with other Proud Boys, in support of his goal to stop the certification of the Electoral College vote.

---

[1] Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity in other Western countries. The group describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values. The group has an initiation process for new members, which includes the taking of an "oath." Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.

Defendant's Previous Interactions with Proud Boys Leadership

The defendant's January trip to Washington, D.C. was not his first travel to this area in connection with the Proud Boys. In December 2020, he traveled to participate in a rally attended by numerous Proud Boys from across the country. While there, he was photographed near Enrique Tarrio, the self-described National Chairman of the Proud Boys, as Tarrio and other Proud Boys conducted a stunt involving mooning the camera. In the photograph below, Tarrio is pictured in the middle, wearing sunglasses and wearing a tan vest. The defendant is on the far left of the photograph, circled in red. While he is not involved in the stunt, he is in close proximity to Tarrio:



At that same rally in December 2020, the defendant was photographed mugging for the camera in Proud Boys gear, along with the group's trademark colors of black and yellow, smoking a cigar. The "FAFO" on the shirt stands for "F*** Around and Find Out," and it if flanked by two rifles:

4



After the December rally, public communications from Proud Boys organizers encouraged members of the Proud Boys to attend the January 6, 2021 demonstration in Washington, D.C. Such communications included messages sent by the Tarrio. For example, on December 29, 2020, Tarrio posted a message on the social media site Parler about the demonstration planned for January 6, 2021. Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist... We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows....we might dress in all BLACK for the occasion." The statement about dressing in "all BLACK" is a likely reference to dressing like the group known as "Antifa," who the Proud Boys have identified as an enemy of their movement and who are frequently depicted in the media clad in black clothing. The post was accessible to any users or guests of Parler's site, and it was reported in the media.

On or about December 31, 2020, Tarrio posted a photograph of Pezzola and other Proud Boys to his public Parler account, with the caption "Lords of War," and the hashtags #J6 and #J20, a likely reference to January 6 and 20, 2021, the dates of Congressional certification of the Electoral College vote and the Presidential Inauguration, respectively:



On January 6, Pezzola followed the commands of leadership (as did many other members of the Proud Boys) and did not wear his "colors" to the events of January 6, in contrast to the photographs above. He also played a major part in what appears to be a coordinated attempt by many Proud Boys and others to physically occupy the Capitol to prevent Congress from completing the certification of the Electoral College vote. Pezzola and other rioters were successful in breaking into the Capitol, causing millions of dollars in damage in the process, and—

for the first time in the 244-year history of the United States—delaying a key part of the peaceful transition of power.

Pezzola's Actions on January 6

Pezzola played a substantial role in the breach of the Capitol.  He is depicted marching with the Proud Boys from the Washington Monument to the Capitol, before then-President Trump's speech from the Ellipse.  He was present near the northwest pedestrian entrance to the Capitol grounds with hundreds of people, including numerous members of the Proud Boys, while the speech was still ongoing.

At around 1:00 p.m. EST, on January 6, 2021, known and unknown individuals broke through the police lines near the northwest entrance, toppled the outside barricades protecting the U.S. Capitol, and pushed past U.S. Capitol Police ("USCP") and supporting law enforcement officers there to protect the U.S. Capitol. The image below depicts a large crowd that was gathered near the northwest pedestrian entrance to the Capitol grounds on First Street. The entrance was secured by a small number of USCP officers, who stood behind a waist-height metal barrier.



Shortly thereafter, two individuals began walking defiantly toward the waist-high metal gate, which was being guarded by only a handful of USCP officers:



The crowd followed, and within minutes, the crowd overwhelmed the USCP officers seen at the top of the steps in the image above.

After overwhelming USCP officers at the pedestrian gate, the crowd advanced on the U.S. Capitol, where another line of USCP officers and barricades attempted to stop the crowd from advancing to the walls of the building and the west-facing plaza. Among those leading the walk to the barricades near the building (and the west plaza of the Capitol) was Pezzola, shown circled below and depicted having with a salt-and-pepper beard and wearing sunglasses. Upon arriving at the next barrier, one of the individuals walking with Pezzola—his co-conspirator William Pepe—dragged a segment of the fence away, shown circled below and depicted wearing a flag bandana, which left USCP officers temporarily without any barrier. Others acted similarly with other barriers.





The next police line, which Pezzola was one of the first to reach, was overwhelmed by the crowd, which physically stormed barriers and fought with police in view of Pezzola. Pezzola walked by one such physical altercation with police and kept pressing forward, as depicted below:



The crowd, including Pezzola, then advanced to the front of the U.S. Capitol. Additional people continued to arrive until what the FBI estimates to be thousands of people had gathered in front of the Capitol on its west side.  Pezzola was one of the thousands of people in this crowd, and he positioned himself near the front of the group, near a line of USCP officers, some of whom were in riot gear.  The top photo below is a zoomed-out photo showing the crowd gathered in the plaza, and the bottom is a cropped version of the same photograph, showing the defendant.[2]

---

[2] A number of other people affiliated with the Proud Boys followed this same path—from the pedestrian entrance at First Street NW to the barriers where Pepe was pictured pulling one aside to the plaza in front of the Capitol, near the front line of USCP.  Those that have been charged so far include Pezzola and Pepe, along with Joseph Biggs (21-mj-126), Ethan Nordean (21-mj-195), William Chrestman (21-mj-218), and Christopher Kuehne, Louis Colon, Felicia Konold, and Cory Konold (charged collectively in 21-mj-216).





Pezzola is not depicted as possessing any sort of riot shield in the photographs above. Shortly after this photograph was taken, members of the crowd began fighting with police. Based on video it appears that this scuffle began shortly after one of the members of the crowd—not Pezzola—was struck and injured by a projectile possibly fired by police. Pezzola can be seen on the video gesturing towards USCP officers before joining the back end of the scuffle and reaching his hand in, towards what appears to be a riot shield. In portions of this video, Pezzola has pulled

a neck gaiter up over his face.  Two screenshots from this video are below, occurring within seconds of each other.  Pezzola is circled.





After the camera pans to the left and right a little, Pezzola seems to emerge with a riot shield in his possession:



Shortly thereafter, Pezzola can be seen walking away from the fray, as it is still going on. Later photographs clearly show him in possession of a riot shield. The top photo below is a screenshot about a minute later in the same video as the two screen shots above, and the bottom is a cropped version of a still photograph taken minutes after that. Pezzola had lowered his neck gaiter by the time of the below images. The clash between rioters and police that the defendant participated in by physically snatching the shield involved the use of pepper spray by both police and rioters.





Shortly thereafter, at approximately 1:48 p.m., according to a video posted originally to the

social media site Parler, and later to the open Internet by *Pro Publica*,[3] a group of individuals

overran a group of USCP officers on stairs that go from the plaza where Pezzola had taken the

shield to the Capitol balcony area one level up.  An individual who appears to match Pezzola in

all material respects—only the back of this individual's head is visible in the video—carries a riot

---

[3]     Parler was taken offline in the aftermath of the January 6 riots.  According to its website, *Pro Publica* combed through archives of public Parler videos, and it posted over 500 videos of the events of January 6, 2021.  The entire catalogue of videos posted *Pro Publica* is available here: https://projects.propublica.org/parler-capitol-videos/.

shield up the stairs soon after the Capitol Police are overrun.  A screenshot of the person carrying the shield, who resembles Pezzola, is below.



Again, after the defendant took advantage of others assaulting police in front of him, individuals and police deployed pepper spray on one another on those stairs as the police tried to stop the rioters from advancing further.  At the top of those stairs, publicly available video shows an individual who resembles Pezzola in all material respects—again, largely the back of his head and this time some profile is visible—yelling aggressively at police officers, including "you better be       f***ing        scared!"     and     other     profanities.     *See* https://www.youtube.com/watch?t=1779&v=P34tO5eaLhg&feature=youtu.be&has_verified=1&bpctr=16 14300778, starting at around 29:30.  At around 33:35, a rioter leans over others from the scaffolding and sprays an unknown liquid at police officers, a short distance from the videographer.  Pezzola is not in frame on that shot, but context before and after that shot establishes that he is still nearby.

At 34:40, Pezzola leans towards a person next to him and says words to the effect of "why don't you shut up, ok? I took this from a f***ing cop." He was still holding a USCP riot shield at the time.[4]

Within the next few minutes, the defendant was at one of the entrances to the west side of the Capitol, with that same shield, using it to break the window, allowing himself and multiple other rioters to be among the first—if not the first—to enter the interior of the Capitol building on January 6.[5]  Screen shots from a video of Pezzola using the shield to break the window are below. Soon thereafter, a number of people—including Pezzola—are seen on video entering the Capitol through the open window.



---

[4]      All representations in this section that Pezzola uttered those words come from the context in the video, as the defendant's back is to the camera.  The Court can of course draw its own conclusions.

[5]      Pezzola was not the only person trying to break windows and forcibly enter the Capitol at that time, but he appears, based on video reviewed by undersigned counsel, to be the first person at this particular entrance to successfully breach a window or door well enough to allow entry.

A photographer also captured Pezzola's destruction of the Capitol window from another angle, and the USCP logo on the shield is clearly visible, as is the earpiece Pezzola was wearing:



One of the Parler videos posted to the *Pro Publica* website follows a number of rioters who entered the Capitol through a door near the window broken by Pezzola. Pezzola can be seen on this video, apparently recording video of himself in the Capitol and yelling excitedly. The defendant appears to still be holding the USCP riot shield. Pezzola was then a part of a group that turned to the right and eventually confronted USCP Officer Eugene Goodman, demanding to know "where they meeting at, where they counting the votes?" It is unclear from the video which member of the mob shouted that question at Officer Goodman.[6] The defendant moved with the crowd upstairs, very near the still-occupied Senate chambers, and when the crowd stopped moving,

---

[6]     The rioters' encounter with Officer Goodman was widely publicized after it video of it from a different angle surfaced, in part because the mob was at that point very close to the Senate chamber, which had not yet been evacuated. Officer Goodman's actions in redirecting this group of rioters, which included Pezzola, may well have kept the rioters out of the Senate chamber. *See*, *e.g.*,     https://www.washingtonpost.com/local/public-safety/goodman-capitol-police-video/2021/01/13/08ab3eb6-546b-11eb-a931-5b162d0d033d_story.html (last visited January 25, 2021).

the defendant was one of a number of rioters who were involved in a stand-off featuring USCP

Officers, including Officer Goodman.  The below photograph is from that time:



In a separate video posted to social media, Pezzola appears to be smoking a cigar and taking

a video of himself with his phone in "Selfie" mode.  A screen shot from that video is below.  In it,

Pezzola can be heard saying words to the effect of, "Victory smoke in the Capitol, boys.  This is

f***ing awesome.  I knew we could take this motherf***er over [if we] just tried hard enough."

The defendant concedes in his motion that smoked the victory cigar because "he considered the objective achieved, stopping the certification of the election pursuant to the instructions of the then President."  ECF No. 19 at 4.



The FBI also spoke to a witness, referred to as W-1 in the affidavit in support of a criminal complaint.  W-1 stated that the defendant, whom W-1 knows as "Spaz," was one of a group of individuals who W-1 stated that other members of the group talked about things they had done during the day, and they said that anyone they got their hands on they would have killed, including Nancy Pelosi.  W-1 further stated that members of this group, which included "Spaz," said that they would have killed [Vice President] Mike Pence if given the chance.  According to W-1, the group said it would be returning on the "20th," which in context likely referred to the Presidential Inauguration, which took place on January 20, 2021.  At the time of the interview with W-1, the

inauguration had not yet occurred.  W-1 stated that the group said that they planned to kill every single "m-fer" they can.[7]  W-1 stated the men said they all had firearms or access to firearms. [8]

<u>The Defendant's Actions After January 6</u>

Location information provided by Pezzola's cell phone provider is consistent with Pezzola traveling from the Rochester, New York area to the Washington, D.C. area on January 5, and returning to Rochester on January 7.  The data also show that, despite consistent activity on Pezzola's phone for the months leading up to the riot at the Capitol, the phone stopped went dark on or about January 9, 2021.  The FBI has also interviewed a witness ("W-3") who said that Pezzola briefly stayed at his home in Buffalo, New York before going to New York City and Philadelphia in the days following January 9.  The lack of use of defendant's cell phone continued through the defendant's surrender in Rochester, New York on January 15, 2021.  Moreover, the defendant's offer to turn himself in to law enforcement did not come until the FBI began knocking on doors in the Rochester, New York area, seeking to speak to family members.  By the time the defendant surrendered, he had shaved his beard.  A copy of the defendant's photograph from the time of his arrest is below:

---

[7]      In a later interview, W-1 stated that the group had no definitive date for a return to Washington, D.C, but W-1 re-iterated that the others agreed there would be guns and that they would be back soon and they would bring guns.

[8]      The defendant speculates that W-1 is a "cooperating witness" with deeper ties to the Proud Boys than the defendant.  The defense is incorrect.  W-1 has not been charged with a crime in connection with the events of January 6, 2021, and the government is unaware of any affiliation between W-1 and the Proud Boys or any indication that W-1 knew the defendant prior to January 5, 2021.



The FBI also executed a search warrant at the defendant's residence at the time of his arrest. Agents recovered, from a room that appeared to be used exclusively by the defendant, a thumb drive that contained hundreds of .pdf files.  While some of those files are related to seemingly innocuous topics, a significant number of those .pdfs provide detailed instructions for making homemade firearms, poisons, and/or explosives.  A sample of titles includes, but is not limited to: (1) multiple serials of a series entitled "Advanced Improvised Explosives," those serials including "Explosive Dusts" and "Incendiaries;" (2) "The Box Tube MAC-11," with subtitle, "The Ultimate DIY Machine Pistol;" (3) "Ragnar's Big Book of Homemade Weapons;" and (4) "The Advanced Anarchist's Arsenal: Recipes for Improvised Incendiaries and Explosives."   All of the above examples contain detailed instructions for how to make the subject matter reflected in their titles, and they are but four of hundreds of similarly titled .pdf files on the recovered thumb drive.

In addition to the above thumb drive, the FBI found a tactical vest featuring patches that say "Proud Boys" and the defendant's nickname, "Spazzo," along with a U.S. Marine Corps patch. The FBI also found additional "Proud Boys" and "Spazzo" patches, along with other Proud Boys paraphernalia.

## Principles Governing Requests for Detention

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure community safety or the defendant's appearance at trial and pre-trial proceedings:  the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *see United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013).  A magistrate judge's determination regarding bail is reviewed de novo.  *See*, *e.g., United States v. Hudspeth*, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001).[9]

At a detention hearing, the government may present evidence by way of a proffer.  *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015).  A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence. *Smith*, 79 F.3d at 1209.   When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence.  *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

---

[9]     Although he acknowledges that this Court's review is *de novo*, the defendant asks this Court not to reconsider certain findings made by the Magistrate Judge, including her finding that the presumption in favor of detention was rebutted and her decision not to address the government's arguments regarding the defendant's risk of flight.  ECF No. 19 at 1-2.  Because this Court's review is *de novo* across the board, the government asks the Court to apply the statutory presumption of detention, which we submit has not been rebutted for the reasons stated below, and find by a preponderance of the evidence that the defendant is a serious risk of flight.

The United States seeking detention pursuant to, *inter alia*, 18 U.S.C. § 3142(e)(3)(C), which provides a rebuttable presumption of detention if there is probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." That rebuttable presumption applies to Defendant because 18 U.S.C. § 1361 is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), and carries a maximum sentence of ten years in prison. The Grand Jury found probable cause to believe that the defendant committed a felony violation of 18 U.S.C. § 1361.

Once a rebuttable presumption is created, it imposes a burden of production on the defendant to offer contrary credible evidence. *See United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). However, "[t]he presumption is not erased when a defendant proffers evidence to rebut it; rather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to the factors listed in § 3142(g)." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008), (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)); *see also United States v. Ali*, 793 F. Supp.2d 386, 387-88 (D.D.C. 2011); *United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) ("[The presumption] is incorporated into the § 3142(g) factors considered by the court when determining whether conditions of release can be fashioned or whether the defendant must be detained pretrial.").

The United States also seeks detention pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) and (f)(2)(A).

**<u>No Condition or Combination of Conditions Will Reasonably Assure the
Community Safety or the Defendant's Appearance in Court</u>**

**1.  Nature and Circumstances of the Offenses Charged**

The circumstances of the offenses charged in this case overwhelmingly support detention. The defendant charged by indictment with multiple gravely serious crimes that occurred during an attempt to occupy the Capitol to prevent Congress from carrying out its duty of certifying the Electoral College results.  Among the things the Court is statutorily required to consider is whether the defendant is charged with any crimes of violence or terrorism.  18 U.S.C. § 3142(g)(1).  He is charged with both.

   a.  <u>Defendant Committed a Federal Crime of Terrorism and Two Crimes of Violence.</u>

Felony destruction of property, under the facts as laid out above, is a federal crime of terrorism.  Title 18, U.S.C., Section 2332b(g)(5), defines "federal crime of terrorism" as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is included in an enumerated list of statutes, which includes § 1361.  *See* 18 U.S.C. §§ 2332b(g)(5)(A) & (B).  The Grand Jury found probable cause in Count Seven of the Indictment to believe that the defendant intended to obstruct an official proceeding by committing, among other things, acts of civil disorder and breaking a window.  The defendant has conceded that his conduct was calculated to influence or affect the conduct of government—specifically the certification of the Electoral College vote—and his actions show that he participated in doing so by intimidation and/or coercion.  Moreover, because § 1361 is listed in § 2332b(g)(5)(B), there is a rebuttable presumption that no conditions or combination of conditions can assure community safety or the defendant's appearance.  *See* 18 U.S.C. § 3142(e)(3)(B).

Felony destruction of government property is also a crime of violence.  For purposes of the bail statute, as relevant to these offenses, a crime of violence is defined as "an offense that has an element of the use, attempted use, or threatened use of physical force against the person or property of another," if that crime is punishable by ten years or more in prison.  *See* 18 U.S.C. § 3142(f)(1)(A) & 16.  Section 1361 of Title 18 of the U.S. Code meets those requirements.  It is punishable by ten years if the property damage was greater than $1,000, and its elements include the use of physical force against the property of another.  *See United States v. Khatallah*, 316 F. Supp. 2d 207, 213 (D.D.C. 2018) (Cooper, J.) (holding that destruction of government property under a substantially similar statute, 18 U.S.C. § 1363, satisfies a substantially similar elements-clause statute to qualify as a crime of violence).

Robbery of U.S. Government Property is also a crime of violence.  *See United States v. Alomante-Nunez*, 963 F.3d 58, 67 (1st Cir. 2020), citing *Stokeling v. United States* 139 S. Ct. 544 (2019) (holding that common-law robbery meets the elements test of a different, but substantially similar statute, to qualify as a crime of violence). *But see United States v. Bell*, 158 F. Supp. 3d 906, 919 (N.D. Cal. 2016) (holding that § 2112 does not meet the elements test, although that opinion was issued prior to the Supreme Court's decision in *Stokeling*).

The defendant is also charged with assaulting a federal officer under 18 U.S.C. § 111(a) and multiple counts of obstructing law enforcement during a civil disorder in violation of 18 U.S.C. § 231(a)(3), as well as conspiring to obstruct law enforcement, with co-defendant Pepe and others, during the course of the civil disorder at the Capitol.  The seriousness of the charges the defendant faces cannot be overstated.

b. <u>The Charges and Defendant's Actions Are Serious.</u>

The charges in indictment are properly characterized as serious due to the possible statutory penalties; the coordinated and determined nature of the defendant's conduct; the defendant's violent actions, along with capitalization on others' violence throughout January 6. He was one of the first people to lead the charge from the public area outside the Capitol grounds to the exterior of the building, where he was on the front lines of a multitude of people who ultimately overwhelmed USCP's defenses. After the barricades blocking access from the plaza were breached, Pezzola was among the first of thousands to flood the plaza outside the Capitol, and he initially positioned himself near the front line of police in riot gear. When those police had to engage in active riot control measures, Pezzola ripped away an officer's riot shield. Only after he had the shield in hand did Pezzola retreat to the back portion of the crowd.

In a matter of minutes, Pezzola was again part of a first line of people who tried to outflank police by going up stairs from the plaza to the next level above it—in the process the crowd again assaulted outnumbered USCP officers—which included the window he ultimately broke with the shield. At the entrance to the Capitol itself, Pezzola was not just on the front lines, but *first* to breach a window so successfully that he and other rioters could enter the Capitol through it.

He later smoked what he called a "victory cigar" inside the Capitol, noting for the camera that he "knew we could take this motherfucker over [if we] just tried hard enough." Pezzola's statement to the camera underscores the government's contention that the evidence establishes both that Pezzola invested a significant personal effort to take over the Capitol and that he did so in coordination with others. The defense's admission that the defendant's objective that day was to stop the certification of the Electoral College vote does not help his position. In essence, he took an active role at the front of a mob that displaced Congress, in an attempt to stop that body

from certifying the result of a Presidential election.  As Judge Lamberth recently found, "[s]uch conduct threatens the Republic itself."  *See United States v. Munchel, et. al.,* No. 21-cr-118 (RCL), ECF No. 24 at 11.  *See also United States v. Meggs*, No. 5:21-mj-1036-PRL (S.D. Fla.) (Lammens, M.J.), ECF No. 17, at 4 ("The [January 6] attack wasn't just one on an entire branch of our government (including a member of the executive branch), but it was an attack on the very foundation of our democracy.")

The defendant claims he committed no violent acts that day.  Putting aside that the Grand Jury found probable cause to believe he committed robbery by force and violence and assaulted a federal officer in the process, the defendant was also present for, and directly benefitted from, a number of other assaults (in the colloquial sense of the term) on federal officers.  He was able to be one of the first individuals past the toppled First Street barriers because those he was with assaulted and trampled USCP officers.  He was one of the first to the plaza to the west of the Capitol because others he was with assaulted USCP officers controlling access to that plaza, and he used that violence to his advantage rather than retreating.  He took by force the riot shield of a USCP officer actively engaged in crowd control.  If it were not for his cohorts' violence, he would not have had the chance to take it, by force or otherwise.  He did not retreat when police used pepper spray on rioters or vice-versa.  He ascended the stairs when he did because he again took advantage of other rioters' actions in overtaking a USCP-manned barrier by force.  He showed no hesitance to break into the Capitol by destroying part of it, thus allowing others who had assaulted federal officers and who were armed with bats and pepper spray to stream in behind him. [10]  The

---

[10] The photograph on page 18, above, shows the defendant standing next to Robert Gieswein, pictured in camouflage, wearing a helmet with orange tape on it, and carrying a bat and what appears to be pepper spray.  Gieswein has been indicted for his role in the events at the Capitol on

defendant's "victory cigar" would not have been possible had he not taken advantage of the very real violence committed before his eyes by other rioters on January 6.

### 2. The Weight of Evidence Against the Defendant

Courts also consider the weight of the evidence in assessing the risk of flight and community danger.  18 U.S.C. § 3142(g)(2).  The weight of the evidence against the defendant is substantial, and indeed he concedes his that there is "ample evidence" supporting his presence at and and participation the events of January 6 in his bond-review motion.  ECF No. 19 at 3.  The defendant's face is clearly visible in numerous videos, which include acts of violence against both law enforcement officers in the line of duty and U.S. Capitol property.  Per the information in the affidavit in support of a complaint, he was identified by, among others, W-2, who has known him for over five years.

### 3. The History and Characteristics of the Defendant

The defendant's history and characteristics likewise support pretrial detention.  The defendant has no criminal convictions of which the government is aware, and he ultimately turned himself in to law enforcement.  However, his flight and change of appearance before turning himself in should weigh heavily against the fact that he did so belatedly in the Court's analysis of his risk of flight.  The defendant moreover did not offer to turn himself in until the FBI began making contact with his family.  The defense claimed in its initial bond review motion, ECF No. 15 at 6, that he would not flee because his entire life is in Rochester.  That statement is belied by his actions between January 9 and January 15 (when he turned himself in)—he fled from Rochester to Buffalo to New York City to Philadelphia, according to W-3, before the FBI came looking.

---

January 6 in Case No. 21-cr-24 (EGS). His charges include a number of assaults on federal officers. Gieswein entered the Capitol shortly before Pezzola, through the window he broke.

The defendant's lack of a criminal record prior to January 6 has to be weighed next to the strength of the government's evidence that he committed these particular offenses, along with the gravity of those offenses as discussed above. That strength is underscored by the defendant's concession of involvement in the case charged here. *See* ECF No. 19 at 7 ("it is clear Pezzola's involvement in this event was an aberration . . . ") and 8-9 (Pezzola "recognizes that he will at some point have to suffer some punishment for his actions . . ."). The crimes the defendant committed on January 6, as noted above, include two crimes classified by Congress as crimes of violence and one classified by that same body as a federal crime of terrorism. Congress has moreover prescribed a rebuttable presumption in favor of detention.

Undersigned counsel agrees that he is not aware of any information regarding the defendant's Proud Boys affiliation prior to November 2020, but in that time he has been photographed near leaders, had his picture held up by the group's self-described chairman as a "lord of war," and taken the actions he took on January 6 in concert with other Proud Boys and in keeping with directives issued by leadership. The defendant's actions show that as recently as a month and a half ago, he was willing to partake in and take advantage of violence to achieve his political ends. The Court can have no assurance that he will refrain from doing so again, despite his alleged disavowal of the Proud Boys since he has been detained.

**4. The Nature and Seriousness of the Danger to Any Person or the Community**

The defendant's conduct on January 6 demonstrates his dangerousness, and the government will not rehash it here after laying it out above.

We do note, however, that according to W-1, the defendant was among a group of people who said that they would be coming back to Washington, D.C., and that they would kill every "m-fer" that they could. The defendant attempts to downplay this statement, disavowing making it or

agreeing with it.   Although the government agrees (and it has never represented to the contrary) that it cannot proffer that the defendant uttered those words, according to W-1, the defendant was present for and agreed with sentiments expressed, including words to the effect that next time the group would bring guns and people would be surprised.  It should also be of little comfort to the Court that January 20 has come and gone with no incident, given the heavy National Guard presence in Washington, D.C. on that date.

Moreover, although the defendant claims to have seen the error in his beliefs about the 2020 election, his actions on January 6 evince someone who was willing to go to great lengths to stop the certification of an election when he believed it necessary to do so.  The Court has no guarantee that the defendant will not go to similar lengths in the future, whether because he believes it necessary or because he is again "duped," as he claimed to be on January 6.  Even taking at face value the defendant's statement claims that he was somehow misled, he still contends his intentions on January 6 were motivated by honorable intentions.  ECF No. 19 at 8.  The defendant has made it clear that he is willing to play a front-line role in a violent revolt to attempt to stop the certification of an election if he believes—despite absence of evidence to support those beliefs— that doing so will protect the country.  The Court can have no confidence that the defendant will not take similar actions in the future if he feels they are justified.

He has shown a willingness to attempt to "go off the grid," as evidenced by his decision to stop using his cellular phone, and to attempt to change his appearance to avoid detection.  He had access, at the time of his arrest, to a significant number of instructions on how to build homemade

guns and homemade explosives, available on a thumb drive.[11]   He showed perseverance, determination, and coordination in being at the front lines every step along the way before breaking into the Capitol.   Given the combination of the defendant's actions on that day, his professed intentions to commit additional violence, and his access to the means to carry out that violence in a largely undetectable way, and in light of the offenses with which the defendant is charged and the presumption in favor of detention, there are simply no conditions nor combinations of conditions of release that can assure the safety of the community or the defendant's return to court if he is released.

---

[11]      The defense contends that Pezzola never opened the thumb drive and that it was instead given to him by a member of the Proud Boys during Pezzola's recruitment.  Even if true, the fact that the defendant was given such material by the Proud Boy who personally recruited him to the group should not give the Court any comfort, especially in the context of what the defendant did with other Proud Boys on January 6.  Moreover, Pezzola voluntarily chose to continue to affiliate himself with a group whose members espoused violence and the use of poisons and weapons, including explosive devices.  The government does agree with the defense that much of the material on the thumb drive is published material.  It does not agree, however, that the material is principally from the "Anarchist's Handbook."  *See* ECF No. 19 at 6, n.3.  According to Amazon.com listings, that book is between 60 and 70 pages long.  The material on the defendant's thumb drive, on the other hand, easily tops 1,000 pages, and while some titles sound innocuous, the vast majority of titles speak to improvised weapons, ranging from DIY guns to poisons to explosives.

**Conclusion**

Under the factors set forth in 18 U.S.C. § 3142(g), the government has demonstrated by a clear and convincing evidence that the defendant is a danger to the community and by preponderance of the evidence that he is a flight risk.  For the foregoing reasons, as well as those that the government will demonstrate at any hearing on this matter, the government requests that the Court order the pre-trial detention of the defendant.

Respectfully submitted,

MICHAEL R. SHWERIN
ACTING UNITED STATES ATTORNEY
N.Y. Bar No. 4444188


By:  __/s/ *Erik M. Kenerson*_____
ERIK M. KENERSON
Assistant United States Attorney
Ohio Bar Number 82960
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov