IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR No. 1:21-cr-00052-TJK-1

                                  Washington, D.C.
v.                                Monday, March 1, 2021
                                  2:00 p.m.

DOMINIC PEZZOLA,

          Defendant.
- - - - - - - - - - - - - - - - x
_____
                TRANSCRIPT OF MOTION HEARING
       HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____
APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Erik M. Kenerson, Esq.
                          Christopher Berridge, Esq.
                          U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
                          555 Fourth Street, NW
                          Suite 11-449
                          Washington, DC 20530
                          (202) 252-7201

For the Defendant:        Jonathan S. Zucker, Esq.
                          LAW OFFICES OF JONATHAN ZUCKER
                          37 Florida Avenue, NE
                          Suite 200
                          Washington, DC 20002
                          (202) 624-0784

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3     criminal matter 21-52, Defendant 1, United States of America

4     v. Dominic Pezzola.

5              Present for the Government are Christopher

6     Berridge and Erik Kenerson; present for the defendant is

7     Jonathan Zucker; present from Pretrial Services is Christine

8     Schuck; and also present is the defendant, Mr. Pezzola.

9              THE COURT:  All right.  Well, good afternoon to

10    everyone.

11             First, I have to start off by asking Mr. Zucker,

12    my practice is to begin all my hearings -- but particularly

13    detention hearings where we are dependent on certain

14    technology that's limited in terms of the number of lines we

15    have to be able to connect to the jail -- is to begin all

16    hearings on time.  So Mr. Zucker, can you tell me why we are

17    beginning this hearing that was scheduled for 2:00 o'clock

18    here at 2:21, by my count, because we were waiting for you.

19             (Brief pause.)

20             Mr. Zucker, you have to unmute yourself.

21             MR. ZUCKER:  Judge, I started signing on to this

22    hearing at five to 2:00 or six to 2:00, and I have no idea

23    why it didn't work.  I had to call -- frankly, call

24    Mr. Kenerson who walked me through it.  I think -- I know I

25    was signed on to a Cisco web conference all by myself.  And

```
 1    that's when I called him and said, What's going on?  Where
 2    is everybody?  And he's forwarded Ms. Harris's email which
 3    she sent us two hours ago and it had the same numbers, and I
 4    don't know why I was by myself and I don't know how it
 5    happened.  I have no explanation.  I don't explain the
 6    technology well enough to know.  I can tell you and assure
 7    you that it was not because I wasn't conscientiously in my
 8    seat signing on ahead of 2:00 o'clock.  I can tell you that.
 9                THE COURT:  All right.  Well, of all --
10                MR. ZUCKER:  Technologically, I can't tell you
11    why.
12                THE COURT:  All right.  Of all the excuses, I know
13    that we've all been struggling with the technology, but
14    obviously it's incumbent upon you -- I think we've already
15    -- you've already appeared before me, I think, by video,
16    but, maybe --
17                MR. ZUCKER:  Yes.
18                THE COURT:  -- maybe, it was by audio.  So --
19                MR. ZUCKER:  No, no, no.  It was by video.  And
20    I've done probably, I don't know, 25, 30, maybe, even 40 of
21    these things, and I have no explanation except, maybe, I had
22    the wrong link numbers.  I really don't know.
23                THE COURT:  All right.  Very well.  I accept that
24    explanation.  But, obviously, particularly in a situation
25    like this where our connection to the jail -- our ability to
```

 1   connect to the jail is limited, it's important that, in the

 2   future, we all be on time and particularly for hearings like

 3   this.

 4             Let me --

 5             MR. ZUCKER:  I appreciate that, Judge.

 6             THE COURT:  All right.  Let me just make a few

 7   comments, then, before I hear from the parties.

 8             Just one, sort of, housekeeping note.  I have --

 9   as far as, sort of, the record of what I have before me, I

10   do have everything that you've filed in this case on paper,

11   both parties, going back to when the case was assigned to a

12   magistrate judge.  I do not have a copy of the transcript

13   before Judge Meriweather, if even there is such a transcript

14   available.  Typically, as Mr. Berridge may know, they're not

15   typically transcribed if the parties don't ask, and so just

16   to make both parties aware, whatever was said or proffered

17   at that hearing, I don't have a way to get at that.  So you

18   all better make -- remake those arguments today because,

19   again, I'll have access to everything that's written that's

20   been filed -- affidavits, etcetera -- but I don't have a

21   transcript of whatever you all argued to Judge Meriweather.

22             The second thing before we begin, I just want to

23   make sure we're all on the same page, kind of, where this

24   case falls in terms of the law.  From the submissions of

25   both parties, I think you both agree that because 1361 is

1    enumerated under 18 United States Code 2332(g)(5)(B) and it

2    has a maximum of 10 years in prison that we are in

3    rebuttable presumption land.

4              Now, Mr. Zucker, you're going to argue to me that

5    you've rebutted it and you've overcome that presumption and

6    we'll have an argument about that -- you'll have an argument

7    about that, but I think we all agree that's where the case

8    fits in and that's the terrain we're arguing on.

9    Mr. Zucker -- but I don't even want to --

10             Mr. Berridge, is that correct from your

11   perspective?

12             MR. BERRIDGE:  Your Honor, it's actually going to

13   be Mr. Kenerson arguing this motion.  So he'll --

14             THE COURT:  All right.  Mr. Kenerson, is that

15   where you are?

16             MR. KENERSON:  Yes, Your Honor.  That's the

17   Government's position.

18             THE COURT:  All right.  And I know the Government

19   has preserved the other arguments, you know, in what they've

20   filed, but it doesn't seem to me they -- they didn't win

21   over Judge Meriweather and that doesn't seem to be the key

22   terrain we're going to be arguing here today.

23             Mr. Zucker, you agree?

24             MR. ZUCKER:  Yes.

25             THE COURT:  Okay.

```
1              MR. ZUCKER:  Yes.  And I also agree with Judge

2     Meriweather's finding that the presumption on flight had

3     been rebutted.

4              THE COURT:  Fair enough.  And I -- that's

5     something, you know -- I do think -- and I appreciate your

6     argument, Mr. Zucker, that I should only, sort of, review

7     part of the decision she made, but I don't think I can do

8     that.  I think if you argue that -- if you want me to

9     review, you know, a slice of her finding and the Government

10    says, Okay.  Fine.  But now, we're going to renew our other

11    arguments for detention, I'm -- frankly, I'm not -- I think

12    this is largely academic, but I think I have to consider all

13    the arguments again and review the entire detention decision

14    that she made.  The Government --

15             MR. ZUCKER:  I don't disagree.

16             THE COURT:  All right.  Very well.

17             So let me just hone in, then, on a couple of the

18    factual pieces here and then I'll just hear you, Mr. Zucker,

19    first -- it's your motion.  I'll hear you first on whatever

20    arguments you'd like to make.

21             But let me just drill in first on this issue of

22    the riot shield and what happened and how Mr. Pezzola ended

23    up in possession of it.  The Government is -- has presented

24    in its motion some sort of, you know, photographic evidence

25    that suggests that Mr. Pezzola took it from a police
```

```
 1    officer.  There's a statement that they -- in one of the
 2    videos that they allege is linked to him where he says, you
 3    know, he took this from a police officer.  I guess my first
 4    -- my question to both parties -- I'll start with you,
 5    Mr. Zucker -- is, does it really matter -- I mean, how
 6    strong -- I mean, I think it does matter how strong that
 7    evidence is.  But as I have to consider -- as I consider
 8    that -- the detention elements before me, the grand jury has
 9    charged Mr. Pezzola with -- I think it's Count 4, is it not
10    -- it's charged him with essentially -- with, by force and
11    violence and by putting in fear, did steal and take from the
12    person in possession of, a Capitol police officer, personal
13    property of the United States containing -- consisting of a
14    riot shield.
15           So the grand jury has decided there's probable
16    cause for that offense.  How -- why shouldn't I, at least
17    for purposes of this detention hearing, consider, you know
18    -- consider that evidence as -- I don't want to say
19    conclusive -- but consider that as sufficient evidence for
20    me to find that, for purposes of this hearing, in fact,
21    that's what happened and Mr. Pezzola did physically remove
22    it from the possession of a Capitol police officer?
23           MR. ZUCKER:  Well, to quote the old legal adage,
24    you can get a grand jury to indict a ham sandwich.  The fact
25    that a grand jury indicted him is, I would say, of -- it's a
```

1    finding that there's reason for the investigation and

2    charges to go forward.  It's certainly not a finding that

3    the fact occurred.  So I guess the question is, how much

4    weight do we give a grand jury finding and an indictment?

5    And, again, the standard for a grand jury is, is there a

6    reasonable probability to believe the crime has been

7    committed and the person accused committed it?

8              So what we have undisputed, I would say, and the

9    Government has presented is evidence that Mr. Pezzola did

10   not bring that shield to the demonstration and there's

11   photos of him without it, and then subsequently there's

12   photos of him holding -- or it appears to be him -- holding

13   a grand jury -- I'm sorry, a shield.  And the question

14   becomes, how did he get it?  Did he get it by force or

15   violence, as the Government alleges, or did he simply pick

16   it up off the ground as part of the confusion and melee when

17   somebody else dropped it?  And the answers to those

18   questions is, I don't think we're sure one way or the other.

19   I don't think the Government has alleged that there's an

20   officer that says, Pezzola took this shield from me.  And I

21   don't think the Government -- they've presented a lot of

22   photos and they're almost, like, a mosh pit of bodies

23   pushing up against each other with Pezzola towards the rear

24   behind some other people and then Pezzola walking away or

25   the person they believe is Pezzola with the shield.  So was

1    it taken by somebody else and dropped?  Was it thrown away?

2    I mean, who knows how it got into his possession?  But I

3    would say there is not sufficient indicia from which we can

4    conclude -- and whether we use preponderance or clear and

5    convincing, it almost doesn't matter.  We really just don't

6    know how he got it or if he just picked it up.

7              Secondly, even if it is taken as something close

8    to what the Government's theory is, does that in and of

9    itself establish the man we're dealing with presents such a

10   danger to the community that there's no combination of

11   conditions of release that could assure the safety of the

12   community?  And that's when we go back to, okay.  That's one

13   little brick, but in the wall of who Dominic Pezzola is, we

14   have a 43-year-old guy who's never --

15             THE COURT:  Mr. Zucker, I'm going to give -- I

16   don't mean to interrupt, but -- I do mean to interrupt, but

17   --

18             MR. ZUCKER:  You're allowed to.

19             THE COURT:  -- the reason I'm interrupting is

20   you're going to get a chance to lay all --

21             MR. ZUCKER:  Okay.

22             THE COURT:  -- that out in a second.  I just

23   wanted to hone in on a few factual questions before you all

24   launch into the full argument.

25             All right.  And I assume, Mr. Zucker -- obviously,

1    you don't have any obligation to make any representation

2    about this at all, but I take from your comments you're not

3    making any representation affirmatively one way or another

4    about what happened with the riot shield in terms of how

5    your client, or even if he, came to possess one.

6                 MR. ZUCKER:  I think you're right, Judge.  I'm

7    commenting on what the evidence presented by the Government

8    is.

9                 THE COURT:  Fair enough.

10                MR. ZUCKER:  Fair assessment.

11                THE COURT:  All right.

12                And so, Mr. Kenerson, why don't you walk me

13   through what the Government's evidence on this point is,

14   again, understanding that this is a, you know -- we're

15   looking at just a few small pieces of, you know, what your

16   broader argument's going to be -- I -- on both sides.  I get

17   that.  But walk me through the facts you have on what

18   happened with the riot shield, what you think the

19   significance of the fact that the grand jury has returned an

20   indictment that charges him with forcibly obtaining it, and

21   what I -- what -- how -- what I'm -- what I should make of

22   that.

23                MR. KENERSON:  Thank you, Your Honor.  Certainly.

24                I would like to start, I suppose, with the grand

25   jury indictment.  We certainly agree with the Court that

1    that is, I think, for purposes of this hearing, a finding of

2    probable cause that the defendant did, in fact, take the

3    shield from the person of a U.S. Capitol police officer by

4    force or violence.  So at least at a probable cause

5    standard, the grand jury has made that finding and the

6    defendant is charged with that offense.

7          Now, the Court, of course, in terms of looking at

8    the bail statute factors, has to consider the strength of

9    the Government's evidence with regards to that offense as

10   well as the circumstances under which it was committed, and

11   that's part of the reason that the Government has proffered

12   the photographs in the pleading as well as the video that we

13   sent the link to the Court about.  And if I could just

14   direct the Court's attention -- I know -- I understand

15   Mr. Zucker is not making a proffer as to what he believes

16   happened.  And I agree with the Court.  He does not have to.

17   And -- but on Page 12 of the Government's opposition,

18   there's a photograph of Mr. Pezzola circled, I guess, at the

19   top of the screen pointing towards a number of Capitol

20   police officers while other people are fighting with them.

21   The photograph, at the bottom of it, shows Mr. Pezzola

22   reaching -- his right arm reaching towards what we would say

23   is a -- what appears to be a clear plastic riot shield that

24   is upright as in -- as if it's being held, not as if it's

25   down on the floor, which is one alternative explanation that

1    Mr. Zucker proposed, and I can proffer to the Court, having

2    viewed that video, that the person just off frame to the

3    left of that photograph who was holding that shield is a

4    U.S. Capitol police officer, and then shortly after that the

5    photograph at the top of Page 13 of the Government's

6    opposition which happens just seconds later, the defendant

7    is pretty clearly in possession of what appears to be a riot

8    shield at that point.  So I think by -- for purposes of this

9    hearing, that certainly creates a pretty compelling

10   inference in the Government's mind that the defendant did,

11   in fact, take that shield from the possession of a police

12   officer.

13          With regards to the video that the Court mentioned

14   as well, I don't hear -- I hear -- I read Mr. Zucker's reply

15   and he says it's not clear who uttered the words about

16   having stolen the shield from a police officer.  I

17   understand that's the defense's position.  The Court, of

18   course, can take a look at it and come to its own

19   conclusion.  I don't hear Mr. Zucker disputing that the

20   person we contend is the defendant pictured in that video --

21   the -- mostly the back of his head, somewhat of a profile --

22   is, in fact, the defendant.  We would note that at the time

23   those words are uttered, the defendant is one of the closest

24   persons in that video to the videographer, and thus if

25   anyone is likely to be picked up by the microphone, it's

1    him.  Being at that location is -- he's -- and he is holding

2    in that video what appears to be a riot shield, as well.

3    Being at that location is consistent with the rest of the

4    defendant's movements as we played them out throughout the

5    day.  And, of course, if someone else is uttering those

6    phrases standing close to the defendant while the defendant

7    is holding a riot shield when, minutes earlier, as laid out

8    by the photographic evidence that we just went through, it

9    would be quite the coincidence.  So we would urge the Court

10   to find that the weight of the evidence on the question of

11   whether the defendant physically robbed a police officer of

12   a riot shield is substantial and more than probable cause

13   based on that evidence that we've presented.

14          As to the Court's second question regarding, you

15   know, kind of, where this fits in in the whole detention

16   argument, of course, the Court has to look at the nature and

17   circumstances of the offense.  This would be another crime

18   of violence in addition to 1361 which the defendant is also

19   charged with.  And Mr. Zucker goes to great lengths in, I

20   think, all of his pleadings made so far to try to argue that

21   the defendant did not commit any acts of violence himself on

22   January 6th.  I think that this evidence of his engagement

23   with Capitol police while Capitol police were engaged in

24   active riot control measures, to rob a police officer doing

25   so of that shield does go to his dangerousness.  I agree

1    with Mr. Zucker.  It's only one act that he committed on

2    that day, but it is one act of many that he committed on

3    that day, and it particularly rebuts his argument that the

4    defendant did no violence that day and did not interfere

5    with law enforcement.

6             THE COURT:  All right.  Mr. Zucker, I'll -- I'm

7    going to hear you in your full argument.  Is there something

8    you want to just say on that one point at this point or --

9    you're muted again, Mr. Zucker.  Sorry.  It's okay.

10            MR. ZUCKER:  I don't want to repeat everything

11   that's in the pleadings.  We've argued them, you know,

12   fairly --

13            THE COURT:  Okay.

14            MR. ZUCKER:  -- specifically.

15            But I think where the lines need to be drawn in

16   this case is we're trying to assess the danger of

17   restraining somebody.  And so when we say, Well, he's

18   accused or the grand jury's found he's technically committed

19   a -- or the probable cause to believe that he's committed an

20   offense and that offense is classified as a violent nature,

21   that shouldn't be the end-all, be-all.  The question is,

22   does his release present a danger to the community?  And in

23   the context of this case, given everything that went on that

24   day, given the fact that, according to the Government's

25   theory -- and they have ample evidence of this --

```
1    Mr. Pezzola was present throughout a large portion of these

2    proceedings and he was right around where violence was

3    occurring, I -- we don't dispute that for a second, but in

4    the context --

5              THE COURT:  All right.  Go ahead.  Go ahead.

6              MR. ZUCKER:  -- but my --

7              THE COURT:  Finish your sentence.

8              MR. ZUCKER:  -- the point I wanted to make, in the

9    context of that, there is no allegation that he ever struck

10   anybody; that he ever --

11             THE COURT:  Okay.

12             MR. ZUCKER:  -- intended to physically injure

13   anyone --

14             THE COURT:  That's a different -- of course,

15   that there may be no evidence that he struck someone or

16   tried to is different than that he didn't engage in any

17   conduct that involved violence, but let's just --

18             MR. ZUCKER:  Well, but I --

19             THE COURT:  Mr. Zucker, we'll -- I'll give you all

20   the time to argue this.  I just wanted to delve into a

21   couple of factual --

22             MR. ZUCKER:  Sure.

23             THE COURT:  -- points first.

24             The next point I just wanted to raise -- and it's

25   almost -- the Government, in their submission, points out
```

1      that in one of the photographs, Mr. Pezzola appears to be

2      wearing a -- more than one of the photographs, actually --

3      appears to be wearing an earpiece, and it's almost

4      un-remarked upon in the Government's submission.  And I

5      guess, Mr. Kenerson, I want to ask you, what should I draw

6      from that?  And have you seen -- is there anything else you

7      can proffer about that -- about what the Government has seen

8      in these cases generally about -- is there any other

9      evidence about -- that suggests what I should draw from that

10     in this context?

11             MR. KENERSON:  Certainly.

12             If we -- the Court can see, I think, from -- I'm

13     scrolling up to give the Court the exact page -- but the

14     photograph of the defendant's co-defendant, William Pepe, on

15     Page 9 of the Government's submission moving aside the

16     police bike racks.  Mr. Pepe appears to be holding a

17     walkie-talkie radio-type device.  We've seen generally that

18     there is evidence that the Proud Boys were using radio

19     devices or at least attempting to do so to communicate.  I

20     can actually proffer that since the Government's submission

21     in this case, we have received indication from search

22     warrants conducted on other subjects that the defendant had

23     ordered a radio off of Amazon ahead of this rally and was

24     trying to get it to work right around the time; we've seen

25     evidence of other people affiliated with the Proud Boys

1    wearing those similar types of earpieces on the day of;

2    we've seen evidence of the Proud Boys discussing, again, in

3    other search warrant returns which particular radio

4    frequencies to use.  So there is evidence that the Proud

5    Boys generally were communicating or at least attempting to

6    communicate by radio on the day of, and that's the type of

7    radio that would be connected to that type of earpiece.

8              THE COURT:  All right.  Mr. Zucker, I'll -- if you

9    have anything on the -- I -- you can -- you're going to be

10   able to argue to me until the cows come home about what this

11   means or doesn't mean.  But do you have any factual

12   representation one way or the other about this earpiece

13   issue?

14             MR. ZUCKER:  I mean, the fact that Mr. Pezzola may

15   have been in communication or attempted to be in

16   communication with other people during the course of this

17   events, I'm not sure that that, in and of -- that

18   contributes to anything in assessing whether or not he was

19   dangerous, considering the -- which is really what we're

20   here for.

21             THE COURT:  It is.

22             MR. ZUCKER:  We --

23             THE COURT:  And I will give you a chance -- I will

24   give you a chance to argue that.  But do you have any -- you

25   don't have any factual representation either way, I assume,

1    on this point.

2           MR. ZUCKER:  I mean, the only thing to say is

3    unless the prosecution could somehow tie it into he was

4    receiving orders or -- I don't think they claim he ever gave

5    orders to anybody.  Unless he was receiving orders that

6    connected it to some dangerous act, it's -- it falls into

7    the category of, okay.  So what?

8           THE COURT:  Okay.

9           MR. ZUCKER:  Not to sound belittling.

10          THE COURT:  Right.  Right.  Okay.

11          The last thing I want to pin the Government down a

12   little bit on is this issue of what Witness 1 has told you,

13   the representations there.  I'm looking at, you know -- Page

14   19 of your submission, you have some of those

15   representations, and then coming back on -- again, on Page

16   30.

17          I guess, looking at -- first starting on Page 19,

18   you know, the first line I have highlighted here, you know,

19   again, we're talking, you know -- Witness 1 stated that the

20   defendant was one of a group of individuals who Witness 1

21   stated that other members of the group talked about things

22   they had done that day, and they said that anyone they got

23   their hands on they would have killed, including Nancy

24   Pelosi.  Witness 1 further stated that members of the group,

25   which included the defendant, said they would have killed

1    Vice President Mike Pence if given the chance.

2              Just to be clear, that -- those representations

3    don't say, as some of the later ones do, that the defendant

4    indicated in some way his assent and agreement to those

5    statements; is that fair?

6              MR. KENERSON:  Yes.  I want to -- I just brought

7    it up when the Court brought this up.  I'm reading the

8    write-up just to make doubly clear before I --

9              THE COURT:  Sure.

10             MR. KENERSON:  -- respond to that.

11             THE COURT:  I mean, there are later -- as I

12   understand it, there are later things that are said about,

13   When we could return, or whatnot and that we'll get to.  But

14   this piece of it, I don't have Witness 1 telling you, the

15   Government -- or I'm sorry, telling the Government --

16   telling Witness 1 and Witness 1, then, turning around and

17   telling the Government that the defendant indicated assent.

18   Those are just in there saying -- basically, for the purpose

19   of saying, for what it's worth -- which is, you know --

20   you'll argue to me -- that this was the group he was with

21   and other members of the group at least expressed these

22   views.

23             MR. KENERSON:  I think that's accurate in terms of

24   how I understand it.  Yes.

25             THE COURT:  Okay.

```
 1              And then as to the next statements which are, you

 2      know -- in some ways, I think, overlap a little bit with

 3      what the Government said on Page 30, there are separate

 4      other statements in which Witness 1 says, you know, We'd be

 5      returning on the 20th, which likely referred to the

 6      inauguration, and then I know you have a footnote that says,

 7      Well, actually, later, the -- Witness 1 said there was no

 8      definitive date, but they would be back soon and they would

 9      bring guns.  A similar kind of statement is reiterated on

10      Page 30 of your submission.  The defendant was present for

11      -- well -- including words to the effect that the next time

12      the group would return, they would bring guns and people

13      would be surprised.

14              So in contrast to the prior two statements I

15      referenced, I just want to make clear, is the Government

16      representing that, you know, this group that indicate --

17      folks in this group in some way said that, We'd be

18      returning -- whether it was on the 20th or some other time

19      in the future -- we would bring guns, and that people would

20      be surprised -- those, I guess, three things -- and that,

21      again, Witness 1 is representing to you and you're

22      representing to me that the defendant in some way indicated

23      his agreement and assent to those statements?  Have I

24      summarized that properly, Mr. Kenerson?  I definitely don't

25      want to -- I want to get this right and make sure I
```

1   understand what's being represented to me, and I certainly

2   don't want to put words in your mouth or anyone else's.

3          MR. KENERSON:  Certainly.  I think the Court is

4   largely correct.  I made -- I will re-read, I think, the --

5   what I read from in front of Magistrate Judge Meriweather,

6   understanding the Court did not have the benefit of that

7   transcript, when she asked a similar question.  What is

8   reported as being attributed to the -- to Witness 1 is that

9   in the hotel room and on the drive home, the others all

10  agreed -- and "others" in that context includes the

11  defendant -- that, Next time, we're going to bring guns, and

12  that, They'll be surprised.

13         THE COURT:  And did -- I'm sorry.  Maybe what you

14  just read indicated this.  But did the witness indicate how

15  the defendant indicated his agreement and assent to this?

16         MR. KENERSON:  No.

17         THE COURT:  Okay.  Can you just read what you read

18  to me again.  I'm sorry.  Just read it --

19         MR. KENERSON:  Certainly.

20         THE COURT:  -- one more time.

21         MR. KENERSON:  In the hotel room and on the drive

22  home, the others all agreed that, quote, Next time, we're

23  going to bring guns, end quote, and that, quote, They'll be

24  surprised, end quote.

25         THE COURT:  Okay.  And by "others," he included --

1    he was referring to a group that included the defendant?

2                    MR. KENERSON:  Yes.

3                    THE COURT:  All right.  But did not attribute any

4    particular statement or any other -- at least you're not

5    representing that there's any particular statement or any

6    particular way the defendant indicated his assessment -- his

7    assent or whether he -- or even whether he said any of those

8    particular things one way or the other?

9                    MR. KENERSON:  That's also correct.  Yes.

10                   THE COURT:  All right.  Very well.

11                   All right.  With all of that, I think that

12   completes at least --

13                   MR. ZUCKER:  Can I respond to that last point,

14   Judge?

15                   THE COURT:  Yeah, please.  You --

16                   MR. ZUCKER:  I didn't want to step on anybody's

17   toes.

18                   THE COURT:  No, no, no, no, no.  Go right ahead.

19                   MR. ZUCKER:  Yeah.  Sure.

20                   I think we need to be clear here.  And I don't

21   accuse Mr. Kenerson of being disingenuous.  Quite the

22   contrary.  I don't -- that's not my experience of him.  But

23   I think what he's saying is that somebody made a statement

24   and he believes -- and that person claims Pezzola was there

25   when the statement was made.  And I don't hear him saying

1    that Pezzola made any response affirmatively or negatively.

2    It's interesting to me because from what I understand of

3    that night and based upon information and belief, most of

4    the ride home when he talks about a conversation in the car,

5    Pezzola was in the back seat asleep because he had stayed up

6    too late the night before.  And regarding the conversations

7    in the hotel room, the information I have is that there was

8    a room that Mr. Pezzola stayed in and he was with some other

9    people, but a large portion of the evening he was not

10   present in that room.

11           So we have an unknown declarant making what I --

12   that was -- that is not subject to cross-examination making

13   statements and he's basically -- sounds like he's inferring

14   Pezzola's assent from a lack of a response, period.  I don't

15   -- I haven't heard Mr. Kenerson say that -- he's very

16   clearly said that Mr. Pezzola did not make those statements

17   or he's not attributing those statements to Mr. Pezzola.

18   And I haven't heard him say that Mr. Pezzola, for lack of a

19   better word, co-signed them or affirmed them or agreed them,

20   just that it was an inference Witness 1 was drawing.  And,

21   of course, we have to say, well, who is Witness 1?  And

22   what's the context under the circumstances where this

23   witness, who is not identified and not subject to cross, is

24   making representations?  And what is that person's

25   motivation?  And the Court's well aware of when we start

1    talking about what cooperating witnesses do and what the

2    inclination is in terms of shading their ability to

3    inculpate other people.  I don't know if this is a

4    cooperating witness or not.  I assume it was, but, maybe,

5    I'm wrong from --

6              THE COURT:  Well --

7              MR. ZUCKER:  Mr. Kenerson's corrected me on one

8    point already --

9              THE COURT:  Right.  He --

10             MR. ZUCKER:  -- where my assumption was incorrect.

11             THE COURT:  Well, he also, I believe, has

12   represented in the, you know -- in his -- in the

13   Government's submission that this is not -- I mean, the term

14   "cooperation" -- "cooperating witness" can mean a lot of

15   different things, but he has at least represented that that

16   person has not --

17             Well, Mr. Kenerson, why don't I let you repeat

18   whatever -- the representations you made in your opposition.

19             MR. KENERSON:  Certainly.  Just one moment while I

20   bring them up.

21             THE COURT:  And, again, I -- before you get to

22   that, let me just jump in and put a fine point on the

23   factual point Mr. Zucker has brought up.  What I have before

24   me -- the submission I have before me on Page 30 says, The

25   defendant was present for and agreed with the sentiments

1    expressed, including words to the effect that next time the

2    group would bring guns and people would be surprised.  I

3    asked you before, Mr. Kenerson, whether you could tell me or

4    whether you had any representation as to how the defendant

5    agreed with this -- these statements and you said, I have no

6    representation on that one way or the other.  Is that --

7    that's accurate?

8              MR. KENERSON:  That is accurate.

9              THE COURT:  Okay.  All right.  And I take

10   Mr. Zucker's representation about what may have been going

11   on there, as well.  But anyway, back to, Mr. Kenerson, what

12   I had asked you before.

13             MR. KENERSON:  All right.  The representation that

14   we had made that Witness 1 -- the defendant had speculated

15   that Witness 1 is a cooperating witness with deeper ties to

16   the Proud Boys than the defendant.  Defense is incorrect.

17   Witness 1 has not been charged with a crime in connection

18   with the events of January 6th, 2021.  The Government is

19   unaware of any affiliation between Witness 1 and the Proud

20   Boys or any indication that Witness 1 knew the defendant

21   prior to January 5th, 2021.

22             THE COURT:  That doesn't -- of course, Mr. Zucker,

23   I'm sure, will point out that that doesn't mean that this is

24   someone who doesn't have an interest in currying favor with

25   the -- none of those things rule out the fact that this

 1    person could have an interest in currying favor with the

 2    Government.  Can you tell me -- Mr. Kenerson, can you tell

 3    me whether the person, you know -- again, hasn't been

 4    charged with a crime.  Is it somebody who -- can you make

 5    any other representations about the status of that person,

 6    including whether they are the subject of an investigation.

 7              MR. KENERSON:  That witness is not, so far as I

 8    know, the subject of any investigation.  The Government has

 9    no reason to believe that that person went inside any

10    restricted area on the Capitol on January 6th.  If that

11    changes -- if the Government reviews more video, that status

12    could change, but as of now that's the Government's

13    understanding.

14              THE COURT:  All right.

15              MR. ZUCKER:  Judge --

16              THE COURT:  So why don't I -- those are the

17    factual points I wanted to go into.  Let me just pause for a

18    moment before I hear you on, sort of, the totality of your

19    argument.

20              Ms. Harris, because we were delayed, how long do

21    we have this line into the jail for Mr. Pezzola?

22              THE DEPUTY CLERK:  Judge Kelly, if you give me a

23    second, I'll just check the schedule and see if --

24              THE COURT:  All right.

25              THE DEPUTY CLERK:  -- anyone's behind us.

```
 1                    (Brief pause.)
 2              So I originally scheduled it for one hour, but
 3     there is no one behind us.
 4              THE COURT:  All right.  Good.
 5              So Mr. Zucker, I'll -- it's your motion.  So I'll
 6     --
 7              MR. ZUCKER:  Thank you, Judge.
 8              THE COURT:  -- hear from you.
 9              MR. ZUCKER:  I just want to say at the outset, I'm
10     somewhat perplexed because part of what Mr. Kenerson said
11     was that -- he referenced conversation in a hotel room;
12     conversations in a car.  I inferred from that, since he said
13     Mr. Pezzola was present, that it had to be the conversation
14     in the car coming from Washington back to Rochester or back
15     to New York State, and my understanding is there were only
16     three people in that car and I -- the other two people
17     certainly would have fit into the category, as far as I'm
18     aware, of persons who were involved in everything
19     Mr. Pezzola was involved in that day or the bulk of it, and
20     so I don't know how to assess this.  I'm just -- I'll just
21     note my confusion and that I'm perplexed and it's -- and
22     accepting Mr. Kenerson at his word, as I have no reason not
23     to, if it's one of the three people that's in the car, it's
24     somebody that's making misrepresentations if they're
25     claiming that they weren't in the Capitol, unless I'm
```

1    thoroughly confused.

2         Anyway, but I think the bigger picture here,

3    Judge, is what we've said ad nauseam.  You have a

4    43-year-old guy who's been a law abiding citizen his entire

5    life; never been accused of a crime; never been accused of

6    violence.  By all accounts, he's a patriot and considers

7    himself a patriot and a citizen.  He served his country.

8    He's honorably discharged.  He's done an admirable job

9    running a business, working.  Everybody speaks in

10   superlative terms of him for everything else in his life

11   other than the allegations of this one day.

12        And I don't -- we can get into a whole political

13   diatribe about what occurred that day and who was a patriot

14   and who was a traitor and why, but I don't think there's any

15   dispute that whatever Mr. Pezzola did -- and he understands

16   now how gravely he was misled and how foolish he may have

17   been in believing what he believed, but nonetheless he

18   believed it -- and, in fairness to him, apparently millions

19   of others did -- that there was an unlawful stealing and

20   interference with our electoral process.  He was encouraged

21   by, you know -- and, as he says, he was -- he's former

22   military.  He took an oath to defend this country against

23   enemies, domestic and foreign, and he thought at the time

24   his actions were intended in that regard.  He wasn't

25   somebody who was trying to get money for himself; he wasn't

1    trying to get, you know, prurient interests satisfied.  He

2    thought he was acting as a loyal citizen.  He now realizes,

3    I think, that he's been deceived and he feels tremendous

4    remorse, tremendous regret and tremendous guilt for the

5    situation that he's -- he was misled into and put his family

6    in jeopardy.  I mean, he's -- this is -- even by the

7    Government's account, this man had, at most, a few weeks'

8    involvement with the Proud Boys, and he's been held under --

9    he's the sole supporter for his wife and children at this

10   point and he's put them in a very bad situation emotionally,

11   physically and financially.  He feels terrible --

12            THE COURT:  Mr. Zucker --

13            MR. ZUCKER:  -- about it --

14            THE COURT:  Mr. Zucker, I just want to focus in

15   just for a moment on what you said about him being misled,

16   you know?  Here's, you know, an otherwise -- as you say,

17   someone who hasn't gotten into trouble before, runs a

18   business, etcetera.  I guess I'm wondering, you know -- we

19   all have agency for our own actions.  And it's hard for me

20   to understand -- and, maybe, this is, you know -- frankly,

21   this is, maybe, something that we're going to be talking

22   about as the case progresses in terms of his culpability

23   which is a separate question than his dangerousness and

24   whether he needs --

25            MR. ZUCKER:  Right.

```
1              THE COURT:  -- whether he should be detained or

2     not.  But doesn't he have the agency to realize -- to make

3     decisions for himself?  I mean, putting this off on him

4     being misled by other people when he's a fully grown person

5     with enough agency to read and decide what things are true

6     and false seems, you know -- that seems like that's going

7     down a problematic road for your client, especially when --

8     I mean, I don't know how it could have been clearer when you

9     have Capitol police officers -- the police officers trying

10    to get people to move back from the Capitol and he's

11    advancing and facilitating folks breaching into the Capitol.

12             MR. ZUCKER:  Judge, I'm --

13             THE COURT:  Go ahead.

14             MR. ZUCKER:  I'm not suggesting this is a legal

15    defense.  I --

16             THE COURT:  Okay.

17             MR. ZUCKER:  -- you know --

18             THE COURT:  Fair enough.

19             MR. ZUCKER:  I'm --

20             THE COURT:  Fair enough.

21             MR. ZUCKER:  -- being candid with you.  But I

22    think in assessing whether or not somebody who's released

23    into the community is a danger, the motivation is fair game,

24    and I think the -- assuming for the sake of argument the

25    allegations in the indictment are true that he actually did
```

1    many of these things, he's legally going to be responsible

2    for some of them, if not all of them, and I don't think we

3    could say, Oh, well, I was misled by the President and his

4    minions into doing this and that's a legal defense.  It

5    isn't.  I know it's not.  But in terms of saying, do we need

6    to preventively detain this guy because his release into the

7    community presents such a risk of danger, understanding his

8    motivation at the time and understanding that he has learned

9    he was a gullible dupe in committing these offenses

10   decreases any possibility that he would ever be involved in

11   that again during his period of release, and I think --

12          THE COURT:  But, Mr. Zucker, how do I know that he

13   thinks he's been duped?  Is there anything in the record to

14   suggest that, for example, the President has stopped

15   claiming that he is the -- he won the election?

16          MR. ZUCKER:  Unfortunately, there's evidence --

17   and it's not in the record.  There's information in the

18   public domain to the contrary --

19          THE COURT:  Yes.  So --

20          MR. ZUCKER:  -- but there is -- I --

21          THE COURT:  -- my point is --

22          MR. ZUCKER:  -- but --

23          THE COURT:  -- my point is what magically -- how

24   could I conclude, then, that your client has somehow come to

25   the conclusion that he was wrong?

```
 1              MR. ZUCKER:  Judge, because I'm making those
 2    representations on his behalf to you and, although he has a
 3    Fifth Amendment right, if you want to inquire, I would allow
 4    him to respond as to whether or not he now realizes what I
 5    had -- what I've proposed.  And I will say to you that it --
 6    my awareness is he has ceased any support or any desire to
 7    be involved with the Proud Boys or any of these other
 8    organizations.  He is so filled with -- and I would invite
 9    you to ask those questions of him.  You're allowed to
10    discuss that kind of stuff, and I will invite you to ask of
11    him those things.  He's communicated it to me; he's
12    communicated it to his family; he's communicated it to those
13    who he's close to; and he's been consistent and he's, you
14    know -- I represent that to you as an officer of the court
15    that that's what's been expressed to me, and I believe it's
16    well founded, and I encourage you to inquire if you need
17    assurances.  It's not --
18              THE COURT:  Okay.
19              MR. ZUCKER:  It's not unusual to say to a
20    defendant when considering conditions of release, If I
21    impose these conditions, are you agreeing to be bound by
22    them, and you understand --
23              THE COURT:  Sure.
24              MR. ZUCKER:  -- you'll be subject -- and I fully
25    encourage you to ask him if he seeks to have any continued
```

1    involvement with Proud Boys or any of these other groups.

2            THE COURT:  But I guess -- Mr. Zucker, here's my

3    -- so let's put aside that -- I'll accept your

4    representation for the moment, but, of course, it's the

5    representation of someone who has now been detained for as

6    long as he's been detained here, for a number of weeks, and

7    it -- I don't -- I -- even -- you couldn't proffer and I

8    don't know that -- how helpful it would be -- I certainly

9    don't have any representation that immediately after what

10   happened, he was regretful.  I have a representation that

11   now that he's been arrested and now that he's been detained

12   that he's regretful.  And so I take your point.  I'm not

13   going to quarrel with it.  But it's of limited value when he

14   spent a number of days -- for example, the evidence that the

15   Government's put forward is -- has -- represents that he

16   changed his appearance; that he bounced around from places

17   avoiding law enforcement.  Now, to be fair and complete the

18   record, he did come in -- I mean, you're going to say it,

19   and I'm -- I acknowledge it.  He came in and did turn

20   himself in.  But I guess my point is, I -- it's -- I can't

21   connect the regret necessarily to the action as much as I

22   can connect the regret to having been caught and being, you

23   know -- the Government seeking to hold him responsible.

24           MR. ZUCKER:  I'm not going to pretend that's not a

25   factor in his --

1              THE COURT:  Okay.

2              MR. ZUCKER:  -- decision, you know?

3              THE COURT:  Fair enough.  Anyway, continue.

4              MR. ZUCKER:  But -- and in terms of the surrender,

5     the information is he voluntarily contacted an attorney and

6     made arrangements to surrender himself.

7              THE COURT:  Yes.

8              MR. ZUCKER:  The allegation that he changed his

9     appearance is that he trimmed his beard, you know?  It's not

10    like he dyed his hair and changed his appearance

11    dramatically or used a false ID or assumed a different

12    identity.  There's none of that.  Could he have turned

13    himself in sooner?  Well, I think the evidence is he turned

14    himself in fairly quickly, within a -- by his version,

15    within hours of learning that there was a warrant, but even

16    by the police version it was within a couple of days of them

17    starting to look for him and asking questions that he came

18    and voluntarily surrendered himself, and I don't think

19    there's any reason to believe he would flee in view of that

20    and, frankly, he doesn't have the financial resources nor

21    the inclination to flee.  This isn't somebody who wants to

22    go on the lam and assume a different identity and he's --

23    except for his military service, I'm not sure he's ever been

24    out of the country.  He's not somebody who's going to go on

25    the lam.  He has three children -- or two children -- I

1    can't remember exactly -- and a wife and a family that he's

2    been part of.

3           He's not -- bottom line, Judge, is there's two

4    factors we have to address here.  One is danger to the

5    community.  And I don't want to repeat everything that's in

6    the motion, but you've got a guy who certainly has shown

7    he's a citizen and not prone towards a criminal disposition.

8    This was one day, a series of acts, an aberrant behavior

9    that he regrets and has learned is foolish, and I think the

10   Court can safely assume he's not likely to be involved in

11   anything like this again, and I invite you to question him.

12   His family has written letters to that effect, too.  They're

13   aware of it, and I think you could accept their

14   representations.

15          So in terms of danger to the community, it's de

16   minimis.  It's de minimis and it can be controlled.  He

17   would be on a GPS.  If he committed a crime, he, you know --

18   we would know about it.  He'd put -- the GPS would put him

19   on the scene.  He's willing to comply with a curfew.  And

20   given all -- given his history, he should be given the --

21   well, I don't think there should even be the doubt, but he

22   should be the -- given the benefit of the doubt.  We don't

23   incarcerate people prior to their convictions here.  And his

24   ability to present a defense and marshal a defense are going

25   to be impaired by his incarceration.

1          The other thing, Judge, and I don't know how this

2     factors into your calculus, but I was not fully aware of it

3     until a couple of days ago.  He's locked down 23 hours a

4     day.  There's great security concerns with these guys.

5     They're not allowed in general population.  That's something

6     that has an incredibly deleterious effect on somebody's

7     psyche to be locked in a cell by yourself -- no television,

8     no radio, no TV, no nothing -- for 23 hours a day.  His

9     mental health is in jeopardy.  And there's no indication

10    that they're going to be able to change those conditions at

11    the jail.  So you know, we don't like to incarcerate people

12    when we don't have to, but in this instance even more so.

13    So -- and I agree with the magistrate judge's finding.  He's

14    not somebody who's going to flee, period.  He doesn't have

15    the resources; he doesn't have the inclination; he doesn't

16    have the abilities.

17          THE COURT:  Mr. Zucker, have you also -- if I

18    remember your submission, you also indicated that

19    Mr. Pezzola's wife would be a third-party custodian for him;

20    is that correct?

21          MR. ZUCKER:  Yes.  And, actually, another

22    representation I -- she's made to me -- yes, she --

23    and she's a former pretrial services supervisor at the local

24    state courts there.  She also, to me last night, said -- and

25    we don't do this too much in D.C., but in a lot of places

1   they have cash bonds.  She says she owns her house free and

2   clear.  Put a bond against her house.  Take her house if he

3   flees.  She'll --

4           THE COURT:  As you --

5           MR. ZUCKER:  -- agree to that and --

6           THE COURT:  As you --

7           MR. ZUCKER:  -- that's how sure she is.  So I

8   would ask the Court to go along with that.

9           THE COURT:  That --

10          MR. ZUCKER:  I don't -- I mean, I don't think the

11  bonds are necessary, but if you want to, she'll give it to

12  you, and that shows you how confident she is in her husband

13  of, I think, about 20 years.

14          THE COURT:  How -- let me ask -- we have

15  Ms. Schuck from Pretrial Services on the line.  Can you --

16  have we screened Mr. Pezzola's wife as a -- as to whether

17  she can be an adequate third-party custodian?

18          THE PROBATION OFFICER:  Just one moment, Your

19  Honor.  Computer's a little slow.

20          THE COURT:  Okay.

21          THE PROBATION OFFICER:  We --

22          (Brief pause.)

23          She did agree to be the third-party custodian and

24  agreed to the -- she did agree.  And, no, we didn't find

25  anything on her.  She would be a suitable -- but Pretrial

1    will note that the defendant actually declined to be

2    interviewed by U.S. Pretrial Services for the Western

3    District of New York.  So we do not have any personal

4    history on him because he wouldn't be interviewed.

5                MR. ZUCKER:  Judge, my --

6                THE COURT:  Okay.  I --

7                MR. ZUCKER:  I just -- my recollection --

8                THE COURT:  Go ahead, Mr. Zucker.

9                MR. ZUCKER:  Yeah.  My recollection is they didn't

10   do a pretrial interview because he was -- he agreed to the

11   extradition here to Washington.  He's certainly willing to

12   be pretrial -- interviewed by Pretrial now.

13               THE COURT:  All right.  All right.  So I just

14   wanted to know the status.  So at least as we sit here right

15   now, our Pretrial Services thinks that she could be a viable

16   third-party custodian; is that fair to say?

17               THE PROBATION OFFICER:  Yes, Your Honor.

18               THE COURT:  All right.  All right.  And but, you

19   know, subject to perhaps him being interviewed.

20               All right.  Mr. Kenerson, then --

21               Mr. Zucker, is that -- does that complete your

22   argument?

23               MR. ZUCKER:  I think the rest of it's covered in

24   the briefs.  I'll be glad to respond to any specific

25   questions.  And --

```
 1              THE COURT:  All right.
 2              MR. ZUCKER:  Oh, I guess -- I think we've already
 3    established that the New York -- the local New York federal
 4    court has a comparable HISP program, and I could be
 5    confusing him with somebody else, but I think they've
 6    already agreed to supervise him.
 7              THE COURT:  Is that --
 8              MR. ZUCKER:  I think, actually, that was -- I
 9    think that was supposed to be the conditions of release in
10    New York, although I might be getting him confused with
11    another defendant.  I'm not sure.
12              THE COURT:  All right.  Ms. Schuck, do we know
13    whether -- I mean, you -- do you -- have you inquired about
14    New York and whether there, you know -- whether there's any
15    reason to believe that they don't have the same kind of HISP
16    program we have here?
17              THE PROBATION OFFICER:  HISP is a local D.C.
18    Pretrial Services program.  Other Districts do what they
19    call location monitoring.  Pretrial Services, at this time,
20    has no reason to believe they do not have location
21    monitoring, but Pretrial Services has not spoken directly to
22    the U.S. Pretrial Services Office for the Western District
23    of New York.
24              THE COURT:  All right.  All right.  Very well.
25              Mr. Kenerson --
```

1                   So you know, that's something we can follow up on.

2                   Mr. Kenerson, I'll recognize you.

3                   MR. KENERSON:   Thank you, Your Honor.

4                   Just to respond to, I guess, a few points raised

5          by Mr. Zucker -- and, of course, would be interested in any

6          questions the Court has for me -- I think the Court hit the

7          nail on the head in its response to -- in its questioning of

8          Mr. Zucker about, kind of, what it means that -- the

9          representations defendant acted out of patriotism here, a

10         professed sense that something had been stolen from the

11         country that he had to act to try to take back on January

12         6th.  In even the Government's view, that doesn't really

13         tilt in his favor here.  He, you know, had a number of

14         potential things at his option that he could do.  He could

15         have organized his fellow citizens to petition for stronger

16         voter fraud laws; he could have tried to lead a petition to

17         get members of -- congressmen and senators that voted to

18         certify the election ousted at the next election by the

19         ballot box; he could have tried to help for a potential run

20         by President Trump in 2024, but instead his patriotism, as

21         put forth by the defense, led him to participate in a

22         violent coordinated assault on the seat of government while

23         that seat was working on the peaceful transition of power.

24                  So even if you ascribe to him the best of

25         intentions, what he actually did was actively work to

1    subvert the transition of power when there are all sorts of

2    means at his disposal to try to work at the things that were

3    concerning to him through lawful means.  And I think the

4    Court really can't have any assurances that he won't

5    participate in anything similar in the future.  Whether

6    because he's duped or he truly believes it, as I think

7    defense has said, the defendant thought that he was acting

8    out of a sense of patriotism like he was acting out of a

9    sense that his country needed to be saved and, you know,

10   there's -- he clearly felt that conviction or some

11   conviction, anyway, strongly enough to take a number of

12   actions coordinated with other people to launch an attack on

13   the Capitol on January 6th.  I -- that's not the type of

14   thing that, I don't think, just goes away briefly.  Even if

15   the Court credits that he has completely disavowed

16   membership in the Proud Boys, if the Court releases him and

17   he becomes -- believed, through duping or otherwise, that

18   there is a similar attack on what he believes to be the

19   Constitution, the American way of life, I think that the

20   evidence of January 6th indicates that he will follow in

21   what he believes to be the right thing for the country.

22           And I think counsel also said that the defendant

23   acted -- this is a one-day aberration.  Certainly, the major

24   events took place on January 6th of this year.  But in terms

25   of just planning beforehand, I think I mentioned to the

1    Court that there's evidence that -- from a different

2    subject's search warrant that the defendant bought a radio

3    ahead of time; that the defendant and other Proud Boys were

4    talking about programming channels for communication.  The

5    defendant very clearly followed the Proud Boys leadership

6    direction from Parler that there be no colors; that he

7    marched with the Proud Boys on that day from the Washington

8    Monument down to the Capitol; he acted in concert with them

9    once the events at the Capitol started up; and once the

10   events had started up, it was very clear from the get-go

11   that those events were going to evolve -- involve violence

12   against law enforcement by someone if the defendant was

13   going to accomplish his goal.  He was right after the first

14   breach of the first barricades which involved running over

15   U.S. Capitol police officers, and he didn't back down;

16   didn't say, Well, this is -- this isn't what I was here for.

17   I wasn't here for assaulting law enforcement.  He took

18   advantage of that assault to move forward and that is, kind

19   of, the case throughout all of this.

20         We agree that we've not put forth evidence that

21   the defendant has struck anyone in the sense that Mr. Zucker

22   has used it, but I think also the clip that the Government

23   sent to the Court, that YouTube clip that includes the

24   discussion about stealing the shield, he is aggressively

25   yelling at police, using profanity, saying, Eff you, talking

1    about the Capitol while he's still holding the riot shield.

2    That puts him in a very oppositional power.  It shows the

3    entire -- his actions on that day show someone that was --

4    thought that the law surrounding the Capitol was something

5    that needed to be physically overtaken to achieve the ends,

6    and the ends, as he conceded, were stopping the peaceful

7    transition of power.

8          I don't think that -- so the defendant planned for

9    this while he was still at home in Rochester; decided to

10   come down here while he was still at home in Rochester.

11   Laws, kind of, designed to protect the peaceful transfer of

12   power and democracy did not deter him.  He believed, kind

13   of, regardless of the source, that he had to storm the

14   Capitol to prevent the certification of the election.  He

15   acted -- I think, as we talked earlier with regards to the

16   robbery of the shield, he himself acted with violence

17   towards the police trying to stop that from happening, and

18   he very much took advantage of the violence perpetrated by

19   others to stop that from happen -- or to try to stop that

20   from happening, and he was very happy about it when he got

21   in, as evidenced by the victory cigar video.

22         Just briefly to respond to the defense's, kind of,

23   contention that the defendant only had a couple of months'

24   affiliation with the Proud Boys, of course, as we said in

25   the motion, we don't necessarily dispute the length of time,

1    but in that length of time he, of course, had gotten to the

2    point where he was being photographed near in time to

3    leadership, but more to the point where the national

4    chairman of the entire organization was holding him out as a

5    warrior in relation to January 6th.  So while he had not

6    been with the organization for very long, he clearly had

7    gotten somewhere within the organization where they

8    considered him a warrior and he acted, kind of, with that --

9    in accordance with that designation on January 6th with the

10   roles that he took in regards to taking over the Capitol.

11            I think that, in addition, the information about

12   Witness 1 and the thumb drive, I think, are concerning as

13   well as it relates to the defendant's dangerousness.  I

14   understand the Court asking the Government about the

15   specifics of what Witness 1 said, and we certainly recognize

16   the limitations of being able to not attribute anything

17   specifically to the defendant.  So we're not asking Witness

18   1's statements to be the be-all, end-all of the Court's

19   analysis here.  It's just one piece of the puzzle.  But the

20   fact that the defendant is with -- and, on some sense,

21   agreeing to, though, if it could be that he didn't object,

22   whatever -- but with a group of people -- traveled down with

23   a group of people who were espousing this type of action and

24   that he possessed this thumb drive, even if you credit him

25   that he never opened it, he is accepting thumb drives and

1    saying that, The person who recruited me to the Proud Boys,

2    this group with whom I precipitated this assault, gave me a

3    thumb drive that included over 1,000 pages' worth of

4    bomb-making and gun-making materials.  I think that that

5    type of association and what the defendant did at the behest

6    of that association should give the Court pause in terms of

7    his dangerousness going forward and that, of course, is all

8    in the context of the fact that the defendant did commit --

9    and the Court does need to consider -- what Congress

10   prescribes for these as a federal crime of terrorism and two

11   separate crimes of violence on January 6th.

12          So I think if the Court has any questions, I would

13   be happy to answer them, but I also agree with Mr. Zucker

14   that a lot of this is covered in the briefs and don't want

15   to repeat too much of what's been written already.

16          THE COURT:  All right.  Let me ask both -- first

17   of all, let me just ask, Mr. Zucker, do you want to respond

18   to anything Mr. Kenerson said here?

19          MR. ZUCKER:  I think -- I mean, he's acknowledged

20   that there's no indication Mr. Pezzola ever opened up this

21   thumb drive, and I don't know what -- it was something that

22   was given out publicly, and I don't know what we --

23          THE COURT:  Well, wait a minute.  Mr. Zucker,

24   let's not -- hold on.  It is -- I understand that

25   information is technically available to the public in some

1    regard, but surely -- and I don't -- whether he opened it or

2    not, okay.  It certainly, you know -- it would be worse if

3    he had.  But you're not going to tell me that -- having that

4    thumb drive in a space in his house or, I believe, where

5    that's closely linked to him, surely you're not going to

6    tell me that's irrelevant.

7              MR. ZUCKER:  I would suggest it's of minimal

8    relevance, with all due respect, unless they could link it

9    to some act.  Okay.  There's this --

10             THE COURT:  Well --

11             MR. ZUCKER:  -- material --

12             THE COURT:  -- Mr. Zucker, the things that have

13   minimal relevance are, you know -- they pile up here.  And I

14   -- part of my job is to look at the whole situation.  And I

15   take it -- your point.  A lot of that whole situation, to be

16   fair to your client, helped, you know -- it is good for him,

17   his -- the fact that he doesn't have a criminal record,

18   etcetera, etcetera, etcetera.  So I take -- I have to take

19   that into account.  I also --

20             MR. ZUCKER:  I appreciate that, but --

21             THE COURT:  -- have to take into account the bad.

22   And the fact that he had that information in his house,

23   there's -- you're not going to convince me that it's

24   minimal.  I mean, I -- that is something that I have to

25   weigh; is it not?

1              MR. ZUCKER:  I'd say that the weight to be given

2        it, it has to be put into the context that there's no

3        indication he ever acted on any of it.  There's not an

4        indication that he went out and got the wiring or the

5        chemical components or the spring loading or anything like

6        that.  So you know, the fact that somebody gave him a jump

7        drive that had nefarious information on it or frightening

8        information on it, yeah.  I mean, I wish it wasn't there.

9        I'm not going to pretend I, you know -- anything else.  On

10       the other hand, I'm certainly encouraged by the fact that

11       there's no indication he ever tried to build a bomb or

12       poison anybody or even, you know, print out any of those

13       materials as part of a preparation of anything.  So you

14       know, do you consider it?  Well, your job is to consider all

15       the evidence.  I'm not -- I don't quarrel with that.  But

16       how much weight we give that one piece of evidence by

17       itself?  I'd say that should be de minimis.

18             THE COURT:  Mr. Kenerson, let me ask you.  One of

19       the things that, I think, is challenging in these cases is

20       the weight we give to, you know, the overall situation that

21       -- the overall events of that day.  And so I'm going to ask

22       you, I guess, first, what about the argument that what

23       happened that day was, sort of, one of a kind; that it's --

24       and this is inherently the argument Mr. Zucker is, sort of,

25       making.  But it -- with -- along with leveraging the

1       defendant's -- the fact that he doesn't have a -- he has no

2       criminal record, doesn't appear to have gotten into any

3       problems beforehand, and that -- but even if, frankly --

4       even putting that aside, the events of January 6th were, on

5       some level -- I think the flip side of the uniqueness of

6       that day, the question for you is, why isn't that, kind of,

7       a one-of-a-kind day that's not going to repeat itself?

8               And the question -- and so I'll just -- and then

9       the flip side of that question about the circumstances that

10      day for you, Mr. Zucker, that I'm going to ask you is, I

11      have to consider that day.  And wasn't that -- isn't it

12      something that weighs strongly against your client about how

13      serious and terrible that day was?  In other words -- and

14      I'll -- it was an almost unique attack on the crown jewels

15      of our country, the peaceful transfer of power.  I mean,

16      when you put it that way -- and I don't -- I think it's very

17      fair to put it that way -- it's almost a unique assault on

18      America in American history, and I think that is something I

19      have to weigh.

20              On the flip side of that, though -- I'll just turn

21      back to you, Mr. Kenerson.  What do I make of the fact --

22      the argument that that day was just so unique, it's just not

23      likely to be repeated?

24              (Brief pause.)

25              MR. KENERSON:  Thank you, Your Honor.  I was just

1    checking to make sure I wasn't muted.

2          So I think the -- I don't want to belabor the

3    point too much because I know the Court's going to hear from

4    Mr. Zucker and the Court has talked about the uniqueness of

5    the event and how it strikes at, kind of, the very

6    foundation of the crown jewels of the country.  I do think

7    that those are all things the Court can, and should,

8    consider.  I understand that's not precisely what the Court

9    is asking me in this case.  Now --

10          THE COURT:  No, I want to ask you the hard

11   question.

12          MR. KENERSON:  Right.  No, I understand that

13   completely.  So I want to give the easy answer and then give

14   the hard answer.

15          THE COURT:  All right.

16          MR. KENERSON:  No, the -- I think that if the

17   Court sees what is going on -- what -- even what was

18   represented by Mr. Zucker as to the defendant's intent here,

19   the defendant's intent was that he believed that an election

20   had been stolen and he believed that the fact of stealing

21   that election struck at the heart of American constitutional

22   government -- governance.  Assuming that the Court credits

23   that that was, kind of, the defendant's frame of mind and

24   what let him to -- led him to come down here and participate

25   in these unique events is that that doesn't just go away.  I

1    mean, I understand that he has said that he now believes he
2    was duped now that he's been locked up, but that that belief
3    doesn't really go away.  And I understand that in the wake
4    of January 6th, there were a number of articles speculating
5    that there might be issues on the 20th; there might be
6    issues at state capitols on the 20th; and, understandably
7    and thankfully, there weren't those issues, but we -- this
8    was what led --
9            THE COURT:  Because -- partly because the city --
10   our -- the Capitol was turned into a fortress.
11           MR. KENERSON:  Yes, that was in part because the
12   Capitol wasn't turned into a -- was turned into a fortress,
13   exactly, and that was in part because of the law enforcement
14   response to what happened on January 6th.  What the Court
15   doesn't know going forward and what could very well happen
16   is that people who believe that the election was stolen
17   could partake in any number of events that either do or do
18   not have the grandeur of this one.  So either there was --
19   I'm not -- I want to be careful that I'm not attributing
20   Mr. Pezzola with what happened over the summer, but as an
21   example there was a -- people charged with an attempt to
22   kidnap the Michigan governor over the summer.  Those types
23   of events, lesser in scale, though still nonetheless violent
24   and still nonetheless striking at the peaceful level of
25   governance, are the danger of what can happen when people

1     who are moved to attack the Capitol by their belief that

2     democracy is under threat believe that they need to act.  So

3     I do agree with the Court that this is unique and it should

4     be treated as unique, but I think that the danger that this

5     event shows in terms of what is potential to happen

6     elsewhere is potentially far-reaching.  This is not just

7     limited to Washington, D.C.  It's limited to governments

8     wherever people may be.

9               THE COURT:  Mr. Zucker, I'll --

10              Thank you, Mr. Kenerson.

11              Mr. Zucker, I'll turn to you.  What about the hard

12    question --

13              MR. ZUCKER:  Yeah.

14              THE COURT:  -- to you?

15              MR. ZUCKER:  I -- well, I guess I have several

16    responses to that.  And let me first tell you, I don't

17    dispute for a second that this was a terrifying day in our

18    history.  I was mesmerized by what was going on, and not in

19    a good way, as I watched it unfold and, frankly, terrified.

20    And I guess I want to say a couple of things.

21              Can I say that there aren't still people who

22    believe in QAnon and other conspiracy theories that are

23    susceptible to behavior like this?  No, I can't say that

24    they don't exist anymore.  I could tell you that if it does

25    happen again, Dominic Pezzola will not be with them.  I can

1    say that with confidence, knowing him the little I do.  And

2    I think part of the reason that it -- that day in particular

3    was so frightening -- because we've faced frightening

4    demonstrations and people who decided to take the law into

5    their own hands for all sorts of unjustified reasons in the

6    past.  What was particularly frightening about that day and

7    why I can say with relative confidence it's not likely to be

8    repeated is because there was a confluence of factors,

9    principally being that the law response on that day was

10   hampered by someone who wanted to see this fostered.  The

11   very person who incited this delayed the law response --

12   the -- delayed the response of law enforcement, you know;

13   interfered with the National Guard's response; and that is

14   something -- I think it's very doubtful we'll ever see

15   anything like that again.  I certainly hope not.

16            THE COURT:  I would say -- Mr. Zucker, I'll just

17   say this.  The evidence on that point -- I don't have

18   anything in evidence -- I --

19            MR. ZUCKER:  Well --

20            THE COURT:  There's nothing in the record here,

21   and then even beyond that I'm not sure that even the

22   evidence in the court of public opinion is very clear about

23   what happened in that regard.

24            MR. ZUCKER:  Well, I think -- and I agree there's

25   nothing in the record of this case that addresses that

1    directly, but I think in the court of public opinion there's

2    a lot of indications that the law response that would be

3    expected in a situation like that did not occur, and the

4    question becomes why, and I think there's certain reasonable

5    inferences.  So --

6              THE COURT:  I mean, but that means -- your

7    argument is, We're, you know -- the law is now -- the -- law

8    enforcement is now ready for my client if he does anything.

9    So --

10             MR. ZUCKER:  Well, I don't want to say my client.

11             THE COURT:  -- now, because of that reason -- I'm

12   just saying that that is your argument; right?

13             MR. ZUCKER:  To an extent, that's not an

14   irrational interpretation of it; that I don't think we'll

15   see the lack of a response from law enforcement like we saw

16   on that day hopefully ever again.  And I think the inference

17   as to why the -- I mean, I've covered other demonstrations

18   from other angles as a legal observer and I've represented

19   demonstrators in other cases.  I've never seen a situation

20   like that.  I've never heard of one where the -- where law

21   enforcement was so outmanned.  It -- that's part of the

22   reason this got insane which isn't a justifiable excuse for

23   people who are accused --

24             THE COURT:  No.

25             MR. ZUCKER:  -- of the crime.  I agree.  I'm not

1    disputing that to you.  But in terms of assuring that it's

2    not likely to happen again, I think that's a factor.  But I

3    go to my primary factor which is the one that's germane

4    towards your decision in this case, and that's that it is

5    highly improbable if anything -- any -- I don't think -- I

6    think Dominic Pezzola is done with politics, period.  He

7    just wants to go back to working and supporting his family

8    and the life he lived before and let these be other people's

9    problems, is his attitude.

10             THE COURT:  All right.  Well, I'm not going to

11   make a -- first of all, anything further, Mr. Zucker?

12             MR. ZUCKER:  No, thank you.  If there's anything

13   else I could respond to?

14             THE COURT:  None -- nothing from me.

15             Mr. Kenerson, anything further?

16             MR. KENERSON:  No, similar position; would be

17   happy to answer any questions the Court has, but otherwise

18   nothing further.

19             THE COURT:  All right.  So I'm going to take this

20   under advisement and get you an answer promptly probably

21   through, you know, an opinion and order as soon as I can

22   pump it out.  If I have any further questions, we -- I can

23   -- any factual -- we'll certainly have our Pretrial Services

24   folks reach out and confirm the possibility at least, you

25   know -- the technical possibility that that other District

1   can indeed do location monitoring and all that, if I were to

2   order it, and we'll go from there.

3           With that, then, I'll just tell the lawyers, thank

4   you for your good arguments.  This is -- these cases pose a

5   lot of interesting and difficult decisions.  Thank you for

6   your submissions, and counsel are dismissed.  Again, as I

7   said, I'll get you an order on this as soon as I can.

8           MR. ZUCKER:  Thank you, Judge.  Good day.

9           MR. KENERSON:  Thank you, Your Honor.

10          (Proceedings concluded at 3:33 p.m.)

11                  * * * * * * * * * * * *

12          **CERTIFICATE OF OFFICIAL COURT REPORTER**

13  **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

14  **that the above and foregoing constitutes a true and accurate**

15  **transcript of my stenographic notes and is a full, true and**

16  **complete transcript of the proceedings to the best of my**

17  **ability, dated this 8th day of March 2021.**

18                          **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                            **Official Court Reporter**
19                          **United States Courthouse**
                            **Room 6722**
20                          **333 Constitution Avenue, NW**
                            **Washington, DC 20001**

21

22

23

24

25