**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| |
| v. |
| |
| DOMINIC PEZZOLA, |
| *Defendant*. |

Criminal Action No. 21-52-1 (TJK)

<u>**MEMORANDUM OPINION**</u>

On January 6, 2021, Defendant Dominic Pezzola, a member of the Proud Boys, was the tip of a spear that pierced the United States Capitol.  The government has proffered photographs and video showing Pezzola at the forefront of a mob charging the Capitol grounds, robbing a police officer of his riot shield, and then using that shield to break a Capitol window, allowing him—and others in the mob—to enter the halls of Congress to disrupt our Nation's peaceful transfer of power.  The Grand Jury has charged him with eleven counts stemming from this assault, including conspiracy to interfere with law enforcement officers engaged in protecting the Capitol and its grounds, robbery of the riot shield from a police officer, and obstruction of an official proceeding before Congress.  A magistrate judge ordered Pezzola held until trial, finding that no condition or combination of conditions would reasonably assure the safety of the community if he were released.  This Court agrees and will order him detained for substantially the same reasons.  Thus, his motion for release will be denied.

I.      **Background**

Pezzola stands charged by the Grand Jury with these eleven offenses: (1) Conspiracy to Commit An Offense Against the United States, in violation of 18 U.S.C. § 371; (2) three counts of Obstructing, Impeding, or Interfering with a Law Enforcement Officer Lawfully Engaged in

the Performance of His Official Duties, Incident to the Commission of a Civil Disorder that Adversely Affects the Performance of Any Federally Protected Function, in violation of 18 U.S.C. § 231(a)(3); (3) Robbery of Personal Property of the United States, in violation of 18 U.S.C. § 2112; (4) Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); (5) Felony Destruction of Government Property, in violation of 18 U.S.C. § 1361; (6) Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); and (7) three counts of Knowingly Entering or Remaining in Any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. §§ 1752(a)(1), (2) and (4).

**A.      Pezzola's Conduct Before January 6, 2021**

The Grand Jury charges that Pezzola and his co-conspirator were members of the Proud Boys, "a nationalist organization with multiple U.S. chapters and potential activity in other Western countries."  ECF No. 12 ¶ 8.  Indeed, one of Pezzola's social-media account pages described him as a "Proud Boy 2nd°."  *Id.* ¶ 9.  "The group describes itself as a 'pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists.'"  *Id.* ¶ 8.  "Proud Boys members routinely attend rallies, protests, and other First Amendment-protected events, where certain of its members sometimes engage in acts of violence against individuals whom they perceive as threats to their values."  *Id.*  "The group has an initiation process for new members, which includes the taking of an 'oath.'"  *Id.*  "Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems."  *Id.*

In December 2020, Pezzola traveled to Washington, D.C. to participate in a rally attended by Proud Boys from across the country.  ECF No. 21 at 4.  He was photographed at the rally near Enrique Tarrio, the self-described National Chairman of the Proud Boys.  *Id.*  Those same

photographs show him wearing "Proud Boys gear, along with the group's trademark colors of black and yellow, smoking a cigar." *Id.* His shirt read "FAFO," which stands for "F*** Around and Find Out," and depicted two rifles. *Id.*

After the December rally, Proud Boys organizers encouraged their members to attend the January 6, 2021 demonstration in Washington, D.C. *Id.* at 5. And on December 29, 2020, Tarrio posted a message on social media about the demonstration planned for January 6, 2021. *Id.* Among other things, Tarrio announced that the Proud Boys would "turn out in record numbers on Jan 6th but this time with a twist. . . . We will not be wearing our traditional Black and Yellow. We will be incognito and we will be spread across downtown DC in smaller teams. And who knows. . . . we might dress in all BLACK for the occasion." *Id.* According to the government, "[t]he statement about dressing in 'all BLACK' is a likely reference to dressing like the group known as 'Antifa,' who the Proud Boys have identified as an enemy of their movement and who are frequently depicted in the media clad in black clothing." *Id.*

On or about December 31, 2020, Tarrio posted a photograph of Pezzola and other Proud Boys to his social-media account, with the caption "Lords of War," and the hashtags "#J6" and "#J20." *Id.* at 6. The latter, proffers the government, are "likely reference[s] to January 6 and 20, 2021, the dates of Congressional certification of the Electoral College vote and the Presidential Inauguration." *Id.* Pezzola is the Proud Boy most prominently depicted in the photograph. *Id.* A few days later, on January 5, 2021, Pezzola traveled to Washington, D.C. along with other Proud Boys from New York State. *Id.* at 3. He stayed at a hotel with his fellow travelers, and "was present at a number of Proud Boys rallying points throughout the day on January 6, 2021." *Id.* The photographs depicting him on that day show, consistent with Tarrio's instructions, that he did not wear his Proud Boys colors. *Id.* at 6, 9–19.

**B.**     **The Capitol Breach on January 6, 2021**

On January 6, 2021, a joint session of the United States Congress convened at the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election. ECF No. 12 ¶ 3. Vice President Michael Pence, in his constitutional duty as President of the Senate, presided over the joint session. *Id*. A large crowd began to gather outside the Capitol as the joint session got underway. *Id.* ¶ 4. Crowd members eventually forced their way through, up, and over Capitol Police barricades, and advanced to the building's façade. *Id*. Capitol Police officers tried to maintain order and stop the crowd from entering the Capitol building, to which the doors and windows were locked or otherwise secured. *Id.* Still, shortly after 2:00 p.m., crowd members forced entry into the Capitol building by breaking windows, ramming open doors, and assaulting police officers. *Id*. Soon after, members of the House and Senate, including Vice President Pence, were evacuated from their respective chambers, and the joint session was halted while law enforcement worked to restore order. *Id*. ¶ 5. Law enforcement regained control over the Capitol later that night, and at about 8:00 p.m., the joint session resumed. *Id.* ¶ 6. During these events, about 81 members of the Capitol Police and 58 members of the Metropolitan Police Department were assaulted, and the Capitol suffered millions of dollars in damage. *Id.* ¶ 7. It was the first time in the 244-year history of the United States that this key part of the peaceful transfer of power was delayed. ECF No. 21 at 6–7.

**C.**     **Pezzola's Conduct on January 6, 2021**

Pezzola played an important role in the events of the day. At around 1:00 p.m., a large crowd gathered near the northwest pedestrian entrance to the Capitol grounds. *Id.* at 7. Photographs show Pezzola and his co-conspirator near the front of a mob that overwhelmed several lines of police officers and barricades and advanced toward the Capitol. *Id.* at 9–10. His

co-conspirator dragged one section of fencing away.  *Id.* at 9.  As the crowd continued to surge

forward, rioters began fighting with police officers on a plaza near the Capitol's west front.  *Id.*

at 11.  Photographs show Pezzola emerging from the scuffle with a riot shield.  *Id.* at 13–14.  Not

long afterward, Pezzola, carrying the riot shield, was captured on video near the front of a mob

confronting police officers on a set of stairs that leads from the plaza to the Capitol balcony, one

level up.  *Id.* at 14–15.  Pezzola yelled profanities at the officers, including that they "better be

f***ing scared!"  *Id.* at 15.  And at one point he told a fellow rioter that he "took this from a

f***ing cop."  *Id.* at 16.  The video then shows the mob overrunning those police officers as

well, advancing closer still to the Capitol.  Shortly afterward, photographs show Pezzola using

the riot shield to break a window on the west side of the Capitol, allowing him and others to

stream into the building.  *Id.* at 16–17.

    One of the photographs of Pezzola breaking the window also shows him wearing an

earpiece.  *Id.* at 17.  Indeed, the government proffers that it has evidence that the Proud Boys

were communicating—or at least trying to communicate—by radios that could connect to

earpieces that day.  ECF No. 24 (Mar. 1, 2021) ("Hr'g Tr.") 17:4–7.  Before the riot, the

government represents that Pezzola ordered a radio online, and was trying to get it to work.  *Id.*

16:19–24.  A photograph appears to show his co-conspirator holding a "walkie-talkie radio-type

device" that day.  *Id*. 16:16–17.  Other Proud Boys were also wearing earpieces like Pezzola's.

*Id.* 16:24–17:1.

    Once inside the Capitol, Pezzola was part of a group that confronted Capitol Police

Officer Eugene Goodman, with one of them demanding to know "where they meeting at, where

they counting the votes?"  ECF No. 21 at 17–18.  Pezzola, like the rest of those rioters, passed

near the still occupied Senate chamber, but was redirected away by Officer Goodman.  *Id.* at 17 n.6.

Before the Capitol could be secured, Pezzola uploaded a victory speech to social media. *Id.* at 18.  Smoking a cigar, he exclaimed: "Victory smoke in the Capitol, boys.  This is f***ing awesome.  I knew we could take this motherf***er over [if we] just tried hard enough."  *Id.* Pezzola concedes that he smoked the victory cigar because "he considered the objective achieved, stopping the certification of the election pursuant to the instructions of the then President." ECF No. 19 at 4.  A witness later told law enforcement that, after the riot had concluded, Pezzola "bragged" about breaking the window of the Capitol and entering the building.  ECF No. 1-1 ¶ 17.

The government also proffers that the same witness told law enforcement that, at their hotel after the riot and on the car ride home, he heard members of Pezzola's group make several statements.  ECF No. 21 at 19–20, 29–30; Hr'g Tr. 21:3–22:9.  Members of the group "talked about things they had done during the day, and they said that anyone they got their hands on they would have killed," including Speaker of the House Nancy Pelosi and Vice President Pence. ECF No. 21 at 19.  According to this witness, whom the government proffers is not the subject of any law enforcement investigation, Hr'g Tr. 26:7–8, members of the group also said they planned to return to Washington, D.C. with guns soon, that people would be surprised, and that they "planned to kill every single 'm-fer' they can."  ECF No. 21 at 19–20, 20 n.7, 29–30.  The government does not proffer that Pezzola made any of these statements, but that he was present for and agreed in some way with the sentiments expressed.  *Id*. at 30; Hr'g Tr. 20:1–22:9. Pezzola responds that he has no recollection of these conversations.  ECF No. 19 at 5.  He

proffers that if these conversations happened in his hotel room, for much of the evening he was not there, and during the car ride home, he was asleep.  Hr'g Tr. 23:3–23:10.

  **D.**  **Defendant's Conduct After January 6, 2021**

  Location information provided by Pezzola's cell phone provider is consistent with Pezzola traveling from where he resides in the Rochester, New York area to the Washington, D.C. area on January 5, and returning to Rochester on January 7, 2021.  ECF No. 21 at 20.  On January 9, though, the phone went dark.  *Id.*  The government proffers that another witness has informed them that Pezzola briefly stayed at his home in Buffalo, New York, before going to New York City, and then to Philadelphia.  *Id.*  After an arrest warrant for Pezzola issued, and law enforcement began knocking on doors in Rochester to speak to Pezzola's family, he arranged to turn himself in to law enforcement on January 15, 2021, by which time he had changed his appearance by shaving his beard.  *Id.*

  **E.**  **The Search Warrant on Pezzola's Residence**

  Law enforcement executed a search warrant at Pezzola's home when arresting him.  *Id.* at 21.  A thumb drive containing hundreds of .pdf files was recovered from a room that appeared to be used exclusively by Pezzola.  *Id.*  Some of those files relate to seemingly innocuous topics, but the government proffers that a "significant number" of them provide detailed instructions for making homemade firearms, poisons, or explosives.  *Id.*  "A sample of titles includes, but is not limited to: (1) multiple serials of a series entitled 'Advanced Improvised Explosives,' those serials including 'Explosive Dusts' and 'Incendiaries;' (2) 'The Box Tube MAC-11,' with subtitle, 'The Ultimate DIY Machine Pistol;' (3) 'Ragnar's Big Book of Homemade Weapons;' and (4) 'The Advanced Anarchist's Arsenal: Recipes for Improvised Incendiaries and Explosives.'"  *Id.*  The government proffers that all these examples "contain detailed instructions

for how to make the subject matter reflected in their titles, and they are but four of hundreds of similarly titled .pdf files on the recovered thumb drive." *Id.* Law enforcement also recovered Proud Boys paraphernalia, including a tactical vest with patches that say "Proud Boys" and Pezzola's nickname. *Id.*

## II.     Procedural History

Magistrate Judge Zia M. Faruqi approved a sealed complaint charging Pezzola on January 13, 2021.  ECF No. 1.  Judge Faruqi issued an arrest warrant that day.  On January 15, 2021, Pezzola surrendered and was arrested.  The government moved for Pezzola's temporary detention on January 27, 2021.  Magistrate Judge G. Michael Harvey granted that motion.  On January 29, 2021, the Grand Jury returned the indictment against Pezzola.  ECF No. 12.  The government moved for pretrial detention of Pezzola that same day.  ECF No. 10.  On February 10, 2021, Magistrate Judge Robin M. Meriweather held a detention hearing and, on February 15, 2021, entered an order detaining Pezzola pending trial.  ECF No. 18.

Judge Meriweather found that the government had shown by clear and convincing evidence that no condition or combination of conditions of release could reasonably assure the safety of any other person and the community.  *Id.* at 2.  She was persuaded of that, in part, by (1) Pezzola's "alleged participation in a group discussion about plans to return to Washington D.C. with weapons, in which members asserted that they would have killed former Vice President Pence or any person they 'got their hands on'" and (2) "the fact that law enforcement found a thumb drive in Mr. Pezzola's house containing files that included instructions for making bombs, firearms, and poisons.  Although no materials for making bombs or poisons are alleged to have been recovered, and the group's alleged plans to return to D.C. have not come to

fruition, the potential for future violent conduct in support of overturning the election of President Biden is too great to be adequately mitigated by any release conditions." *Id.* at 4.

Pezzola filed this motion on February 18, 2021.  ECF No. 19.  The Court held a detention hearing on March 1, 2021.

## III.   Legal Standard

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, "Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)).  Thus, a detention hearing must be held at the government's request only "in a case that involves" a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B).

A subset of offenses requiring a detention hearing triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" that subset of offenses.  *Id.* § 3142(e)(3).  This subset includes any "offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed."  *Id.* § 3142(e)(3)(C). The presumption places "a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018) (quoting *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985)).  And even when the defendant offers evidence to rebut the presumption, it "is not a 'bursting bubble'

that becomes devoid of all force once a defendant has met his burden of production." *Taylor*,
289 F. Supp. 3d at 63 (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)).
Instead, it is "incorporated into the other factors considered by this Court in determining whether
to grant a conditional release and is given substantial weight." *United States v. Ali*, 793 F. Supp.
2d 386, 391 (D.D.C. 2011).

The BRA provides that a judicial officer "shall order" the "detention of the [defendant]
before trial," if, after a detention hearing held under 18 U.S.C. § 3142(f), and upon consideration
of "the available information concerning" enumerated factors, *id*. § 3142(g), "the judicial officer
finds that no condition or combination of conditions will reasonably assure the appearance of the
person as required and the safety of any other person and the community," *id.* § 3142(e)(1).  "In
common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to
the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019).  The
BRA "requires that detention be supported by 'clear and convincing evidence' when the
justification is the safety of the community." *United States v. Simpkins*, 826 F.2d 94, 96 (D.C.
Cir. 1987).  Even if the defendant does not pose a flight risk, danger to the community alone is
sufficient reason to order pretrial detention.  *Salerno*, 481 U.S. at 755.  In assessing whether
pretrial detention or release is warranted, the judicial officer must "take into account the
available information concerning" these four factors: (1) "the nature and circumstances of the
offense charged, including whether the offense is a crime of violence"; (2) "the weight of the
evidence against the person"; (3) "the history and characteristics of the person, including . . . the
person's character, physical and mental condition, family ties, employment, financial resources,
length of residence in the community, community ties, past conduct, history relating to drug or
alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and (4)

"the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam).

If a defendant is ordered detained under § 3142 by a judicial officer, including "by a magistrate judge," the BRA allows the defendant to "file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The statute does not specify the standard of review to be applied by a district court reviewing a magistrate judge's detention order, and "the D.C. Circuit has not yet addressed the issue." *United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017). That said, both the BRA and the Federal Magistrates Act, 28 U.S.C. § 636, support the conclusion, reached by every circuit to have considered the question, that a district court reviews a magistrate judge's release or detention order de novo. *See United States v. Chrestman*, 21-mj-218 (BAH), 2021 WL 765662, at *5–6 (D.D.C. Feb. 26, 2021). And courts in this District routinely apply that standard. *See id.* at *6; *Hunt*, 240 F. Supp. 3d at 132–33.

## IV.    Analysis

The government mainly seeks to detain Pezzola under 18 U.S.C. § 3142(e)(3)(C), which provides a rebuttable presumption of detention if there is probable cause to believe that he committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed."[1] For the below reasons, the Court agrees that a rebuttable presumption arises from the charges against Pezzola but that

---

[1] The government also argues that Pezzola should be detained under 18 U.S.C. §§ 3142(f)(1)(A) and (f)(2)A). ECF No. 21 at 23.

the evidence he proffers is enough to rebut it.  Still, after considering all the § 3142(g) factors,

the Court finds that the government has shown, by clear and convincing evidence, that "no

condition or combination of conditions will reasonably assure" the safety of the community, 18

U.S.C. § 3142(e)(1), and therefore orders that Pezzola be detained pending trial.[2]

### A.    A Rebuttable Presumption of Detention Arises from the Charges Against Pezzola

Pezzola does not contest that a rebuttable presumption of detention—that no condition or

combination of conditions will reasonably assure the appearance of the person as required and

the safety of the community—arises from at least one of the offenses with which he has been

charged.  Hr'g Tr. 4:22–5:25.  The Grand Jury found probable cause to believe that he

committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which

a maximum term of imprisonment of 10 years or more is prescribed."  18 U.S.C. § 1361, one of

the charged offenses, is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B)(i).  And in cases

such as this one involving alleged damage or attempted damage to property of the United States

in excess of $1,000, that offense carries a maximum sentence of ten years in prison.  Thus, the

rebuttable presumption arises.

### B.    Pretrial Detention Factors

#### 1.    The Nature and Circumstances of the Offense

The first statutory factor requires the Court to consider "the nature and circumstances of

the offense charged."  18 U.S.C. § 3142(g)(1).  Because of the unique nature of the Capitol

breach, with perhaps hundreds of individuals facing charges for their roles in obstructing the

peaceful transfer of power, courts have looked to several factors to differentiate and assess the

---

[2] The government does not press the argument that Pezzola is a flight risk very far, and like Judge Meriweather, this Court does not find it persuasive.  The Court does not order that Pezzola be detained for this reason.

particular conduct of each defendant for purposes of pretrial detention. *See, e.g.*, *Chrestman*, 2021 WL 765662, at *7–9. Those factors include whether a defendant (1) has been charged with felony or misdemeanor offenses; (2) engaged in prior planning before arriving at the Capitol; (3) carried or used a dangerous weapon during the riot; (4) coordinated with other participants before, during, or after the riot; or (5) assumed a formal or informal leadership role in the assault by encouraging other rioters' misconduct; and (6) the nature of the defendant's words and movements during the riot, including whether the defendant damaged federal property, threated or confronted law enforcement, or celebrated efforts to disrupt the certification of the Electoral College vote. *Id.*

Here, these considerations weigh strongly in favor of detention. To recap: the Grand Jury has charged that Pezzola and his co-conspirator were a member of the Proud Boys, an organization linked to violence that had announced on social media its plan to turn out in large numbers in Washington, D.C. on January 6, 2021, "incognito" and "spread [out] . . . in smaller teams." About a week before the riot, a Proud Boys organizer held Pezzola out as a prominent member of the group, labeling him a "Lord[] of War." On January 5, Pezzola and other Proud Boys traveled together from New York State to Washington, D.C. The government proffers that shortly before then, Pezzola bought a radio device that could be used to communicate with other members of the group through an earpiece, and photographs show Pezzola wearing an earpiece on January 6. Photographs, video, and Pezzola's own statements show that on January 6, he and his co-conspirator were some of the first rioters to breach the barricades blocking access to the Capitol plaza; Pezzola took a Capitol Police Officer's riot shield as officers were trying to quell the riot; Pezzola was among the first to confront officers on a set of stairs leading from the plaza to the Capitol balcony, warning them that they "better be f***ing scared!"; Pezzola was among

the first to rush past those officers to make it to the balcony; Pezzola used the riot shield as a weapon to break a Capitol window, allowing himself and others to be among the first to stream into the building where Members of Congress and Vice President Pence were performing their constitutional duties; Pezzola was among the first to confront Officer Goodman; and Pezzola uploaded a speech to social media, smoking a victory cigar and bragging that "I knew we could take this motherf***er over [if we] just tried hard enough." Finally, Pezzola concedes that he smoked the cigar because "he considered the objective achieved, stopping the certification of the election pursuant to the instructions of the then President." ECF No. 19 at 4.

As part of this factor, the Court must also consider "whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). As a result of the above conduct, the Grand Jury has charged Pezzola with eight serious felonies and three misdemeanors. ECF No. 12. The government argues, and Pezzola does not contest, that one of the offenses, Felony Destruction of Property, is properly characterized as a federal crime of terrorism under the facts proffered by the government.[3] ECF No. 21 at 24; ECF No. 22 at 4. It also argues, and Pezzola does not contest, that the same offense is also a crime of violence, defined as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *See* 18 U.S.C. § 3142(g)(1) & 16(a).[4]

---

[3] Title 18, U.S.C., Section 2332b(g)(5), defines "Federal crime of terrorism" as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is included in an enumerated list of statutes, which includes § 1361. *See* 18 U.S.C. §§ 2332b(g)(5)(A)–(B).

[4] The Court notes that it is not clear whether Section 1361 of Title 18 of the U.S. Code meets these requirements. *See United States v. Watkins*, 21-cr-28-3 (APM), ECF No. 35 (D.D.C. Feb. 23, 2021) 11:9–21 (questioning whether "depredation of government property would necessarily

Pezzola is also charged with other serious offenses, even if they are not Federal crimes of terrorism or crimes of violence. For example, he is charged with Obstruction of an Official Proceeding—the process of Congress certifying the Electoral College vote—in violation of 18 U.S.C. § 1512(c)(2), an offense for which the maximum term of imprisonment is 20 years, and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

In sum, the proffered evidence shows that Pezzola came to Washington, D.C. as a key member of a broader conspiracy to effectively steal one of our Nation's crown jewels: the peaceful transfer of power. He then played a prominent role in using violence to achieve those ends by, among other things, robbing a police officer of his or her riot shield and breaking a window of the Capitol to allow rioters to enter. Because of all that, he is charged with very serious crimes that subject him to very serious penalties. Thus, the nature and circumstances of the offense show a clear disregard for the law and the Constitution. More than that, though, they show a willingness to use violence and to act in concert with others to obstruct essential functions of the United States government. And Pezzola's refusal to obey the lawful orders of law enforcement throughout the day suggest that he would not comply with conditions of release to keep the public safe. This factor weighs very strongly in favor of detention.

### 2.      The Weight of Evidence Against Pezzola

The weight of evidence against Pezzola is strong. As Judge Meriweather noted, most of the evidence proffered by the government is in the form of photographs and video that show Pezzola, among other things, using the riot shield to break the Capitol window. ECF No. 18 at 3. Pezzola does not deny that he was present inside the Capitol on January 6. ECF No. 19 at 4;

---

involve the use of violence"). But the parties have not briefed the issue, and because the Court's analysis does not turn on it, the Court need not resolve it.

ECF No. 22 at 2.  And while he quibbles about the evidence concerning how he obtained the riot

shield, *id.* at 3; Hr'g Tr. 8:8–9:6, the circumstantial evidence that he obtained it by force, which

includes his own statement on video that he "took [it] from a f***ing cop," is substantial.  This

element also weighs strongly in favor of detention.

### 3.      Pezzola's History and Characteristics

Pezzola's history and characteristics are somewhat of a mixed bag.  Pezzola is 43 years

old and has spent his life in Rochester, New York.  ECF No. 15 at 5–6.  He has no criminal

record.  *Id.* at 5.  After graduating from high school, he served in the Marine Corps as a reservist

for six years and was honorably discharged with the rank of corporal.  *Id.*  Pezzola lives with a

woman that his counsel describes as his common-law wife, who is a former pretrial services

employee, and his two daughters.[5]  *Id.* at 6, 6 n.7.  Most of his family lives in the Rochester area.

*Id.* at 6.  He owns his own flooring installation company and employs other members of the

community.  *Id.* at 5–6.  His family depends on him for financial support.  *Id.* at 6.  Friends and

family describe him as a positive influence in the community.  *See, e.g.*, ECF No. 23-1 at 2; 23-4

at 1.  And he arranged to turn himself in to law enforcement.  ECF No. 22 at 5.

All of this is to Pezzola's credit and reflects that he does not pose a flight risk.  It is even

enough, the Court finds, to rebut the presumption of detention as to his dangerousness that arises

from the charges against him, although, as noted, the presumption remains "incorporated into the

other factors . . . in determining whether to grant a conditional release and is given substantial

weight."  *Ali*, 793 F. Supp. 2d at 391.

---

[5] The Court notes that New York State does not appear to recognize common law marriages.  *See Mott v. Duncan Petroleum Trans.*, 51 N.Y.2d 289, 292 (1980) ("It has long been settled law that [ ] New York does not itself recognize common-law marriages.").

But there are other aspects of Pezzola's history and characteristics that prompt significant concern about the danger he poses to the community.  The gravity and boldness of his alleged offenses, which reflect a flagrant disregard for the law and our constitutional order, cannot be overstated.  As one court observed, the conduct he is charged with "threatens the republic itself." *United States v. Munchel*, 21-cr-118 (RCL), 2021 WL 620236, at *5 (D.D.C. Feb. 17, 2021). Significantly, Pezzola did not act alone that day, but with the Proud Boys, an organization of like-minded individuals connected to violence whose members remain in the community.  And while Pezzola turned himself in to law enforcement after a warrant issued for his arrest, the proffered evidence suggests that he made a stab at changing his appearance and may have relied on that organization's network by staying in several other cities before returning home.

The government also proffers that the specific group of Proud Boys that Pezzola was with in Washington, D.C, said that "anyone they got their hands on they would have killed" that day, and that they planned to return to the city with guns soon, that people would be surprised, and that they "planned to kill every single 'm-fer' they can."  While the government does not proffer that Pezzola made any of these statements, and Pezzola suggests that this may have happened when he was asleep or not present, the witness says Pezzola agreed in some way with the sentiments expressed.  And on top of that, the government proffers that a thumb drive was found in Pezzola's house that contained voluminous instructions for making bombs, firearms, and poisons, suggesting that he was interested in assisting the group to carry out more violence in some way.

To be sure, Pezzola represents that his involvement with the Proud Boys was short-lived, ECF No. 19 at 3–4, and that, in any event, he now renounces his association with them, *id.* at 8; ECF No. 22 at 5 n.4.  But given the proffered evidence of Pezzola's deep (if not long)

involvement with them, his willingness to play an important role in their plans to use violence to

disrupt the certification of the Electoral College vote, the statements attributed to his associates

and his proffered agreement with them, and the materials found at his home, the Court cannot

give much weight to his attempt to distance himself from the organization only after being

arrested and detained.[6]   And even though he also represents that he "feels great remorse and

regret" for what he did on January 6, ECF No. 19 at 7–9, and that he wishes to accept

responsibility for his actions, *id*. at 9 n.6, his bald assertion that "there is no indication nor claim

that he ever was a participant in the violence that was occurring around him," ECF No. 22 at 2, is

flatly contradicted by the evidence proffered by the government and the charges the Grand Jury

has returned against him.  On balance, Pezzola's history and characteristics narrowly weigh in

favor of detention.

>    **4.      The Nature and Seriousness of the Danger to Any Person or the
>             Community that Would be Posed by Pezzola's Release**

The nature and seriousness of the danger posed by Pezzola's release also supports pretrial

detention.  The same considerations that informed the Court's analysis of the nature and

circumstances of the charged offenses are probative here.  The proffered evidence shows that

before the Capitol assault, Pezzola engaged in planning and coordination with other Proud Boys,

including by arranging concealed means of communicating by radio during the riot; that Pezzola

helped facilitate the lawlessness of others by advancing near the front of the mob as it overran

law enforcement lines at various points; and that he robbed a police officer of a riot shield and

used it as a weapon to break a Capitol window, thereby playing an important role in allowing

---

[6] Similarly, the Court cannot place much weigh on Pezzola's representations that only now, after
being arrested and detained, does he realize that he was wrong to believe that the 2020
Presidential Election was stolen, and that he was duped by certain politicians and journalists.
ECF No. 19 at 8; ECF No. 22 at 4–5.

rioters to enter the building and physically endanger Members of Congress and Vice President Pence.  He did so, in many cases, against the explicit orders of law enforcement officers. Smoking a cigar, he exclaimed: "Victory smoke in the Capitol, boys.  This is f***ing awesome. I knew we could take this motherf***er over [if we] just tried hard enough."  And he did so, by his own admission, to stop Congress's certification of the Electoral College vote.

As one court found, these sorts of considerations, "because they reflect the depth of a defendant's disregard for the safety of others, for our democratic institutions, and for the rule of law, necessarily reflect the significance of the immediate threat a defendant presents to the community in which he resides and the threat posed by his disrespect for the U.S. Constitution and official directives to the nation as a whole."  *Chrestman*, 2021 WL 765662, at *15.  And as Judge Meriweather found, the government's proffer that Pezzola's associates threatened future political violence here in Washington, D.C. with firearms, that Pezzola agreed with those threats in some way, and that voluminous instructions for making bombs, firearms, and poisons were found in his home, ratchet up these concerns significantly.

The Court also finds that, on this record, there are no conditions or combination of conditions that would reasonably assure the safety of the community if Pezzola were released pending trial.  He requests that he be released on his own recognizance, or in the alterative suggests that he be released to the third-party custody of his common-law wife, with location monitoring and a curfew that permits him to work outside his home.  ECF No. 19 at 9; Hr'g Tr. 34:10–35:20.  But the planning that Pezzola did for January 6—at a minimum, obtaining the radio—apparently took place while he was living at home with her.  He arranged to travel to Washington, D.C. to participate in the riot while living at home with her.  And he apparently obtained and retained instructions for making bombs, firearms, and poisons while living at home

19

with her.  In any event, location monitoring technology, and any restriction that the Court might

place on Pezzola's whereabouts or use of a phone or internet to contact other Proud Boys or co-

conspirators, ultimately rely to some degree on a defendant's voluntary compliance.  As another

court recently observed, a "determined defendant can cut off an ankle monitor, ignore travel

restrictions, elude a third-party custodian . . . and endanger his community."  *Munchel*, 2021 WL

620236, at *7.  And the proffered evidence shows that Pezzola was quite determined on January

6.  Given all the above, including his alleged failure to comply with directives from law

enforcement officers that day, the Court is not persuaded he would adhere to conditions imposed

by the Court, despite his post-arrest disavowal of his actions.[7]

## V.      Conclusion

For all the above reasons, upon consideration of Pezzola's motion for pretrial release, the

government's opposition, and Pezzola's reply, the evidence proffered and arguments presented

in connection with the motion, including at the detention hearing, the entire record, and the

factors set forth in 18 U.S.C. § 3142(g), the Court finds that all four statutory factors favor

pretrial detention, and the statutory presumption of detention, while rebutted, also weighs in

favor of detention.  Thus, the government has met its burden of establishing, by clear and

convincing evidence, that no condition or combination of conditions can be imposed that would

---

[7] At the detention hearing, Pezzola's counsel suggested that the Court could "[p]ut a bond against [Pezzola's common-law wife's] house.  Take her house if he flees."  Hr'g Tr. 36:25–37:3.  But the Court's ruling does not turn on Pezzola's risk of flight.  And on the record here, the Court cannot find that any such bond would reasonably assure the safety of the community.  The proffered evidence shows that on one occasion already, Pezzola was willing to play an important role in an act of political violence that injured many law enforcement officers and could have injured or killed Members of Congress and Vice President Pence, without apparent regard for the effect it could have on his finances or his family.  And according to the government's proffer, Pezzola expressed agreement with his associates' intent to engage in violence again.

reasonably assure the safety of the community if he were released pending trial.  18 U.S.C.

§ 3142(e)(1).  The Court will therefore deny Pezzola's motion in a separate order.


/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 16, 2021