# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

**v.**

**DOMINIC PEZZOLA,**

*Defendant.*

**No. 21-cr-0052 (TJK)**

## DEFENDANT PEZZOLA'S MOTION FOR BAIL TO PLACE DEFENDANT ON CONDITIONAL RELEASE PENDING TRIAL

Defendant, Dominic Pezzola, by and through undersigned counsel, Martin H. Tankleff and Steven Metcalf, respectfully moves this Court, pursuant to the Bail Reform Act of 1984, 18 U.S.C. 3141, *et seq.*, to release the defendant on personal recognizance.

Alternatively, if the Court is not amenable to release defendant on personal recognizance, defendant moves this court to release defendant into the third-party custody of his wife and commit him to the supervision of a High Intensity Supervision Program (HISP) with GPS monitoring by local Pretrial Services.

If the Court deems that Dominic isn't entitled to bail, he respectfully moves for a Court order permitting him to possess in his cell a laptop computer so he can review all discovery and participate in his own defense.

Dated:  July 9, 2021

Respectfully Submitted,

*Martin H. Tankleff*

MARTIN H. TANKLEFF, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Pezzola*
99 Park Avenue, 25th Floor
New York, NY 10016
*Phone* 646.253.0514

*Fax* 646.219.2012

*/s/* **Steven A. Metcalf II, Esq.**

_____

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for the Defendant*
99 Park Avenue, 25th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012
metcalflawnyc@gmail.com

## CERTIFICATE OF SERVICE

We hereby certify that, on July 9, 2021, the forgoing document was filed via the Court's electronic filing system, and sent to the AUSA via email, which constitutes service upon all counsel of record.

Respectfully Submitted,

*Martin H. Tankleff*

MARTIN H. TANKLEFF, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Pezzola*
99 Park Avenue, 25th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012

*/s/* **Steven A. Metcalf II, Esq.**

_____

STEVEN A. METCALF II, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Pezzola*
99 Park Avenue, 25th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012
metcalflawnyc@gmail.com

## PREAMBLE

Fyodor Dostoyevsky once stated, "A society should be judged not by how it treats its outstanding citizens, but by how it treats is criminals."  At the Hubert Humphrey Building dedication, Nov. 1, 1977, in Washington, D.C., former vice president Humphrey spoke about the treatment of the weakest members of society as a reflection of a government: "The moral test of government is how that government treats those who are in the dawn of life, the children; those who are in the twilight of life, the elderly; those who are in the shadows of life, the sick, the needy and the handicapped."

Denny Scott quoted Gandhi as saying: "The measure of a civilization is how it treats its weakest members." A related quote, "The greatness of a nation can be judged by how it treats its weakest member," is also attributed to Gandhi.

If there is any justice in our society, it is to grant bail to defendant, especially since in 1988, undersigned counsel, while under indictment for double murder was released on one-million-dollar bail and reduced after several months of freedom.[1]

---

[1] Judge Thomas Mallon also ordered that the youth, Martin Tankleff, 17, remain free on $1-million bail after arraigning him on second-degree murder charges in his father's death.  *2 Asst. Das Barred in Tankleff Trial*, 1988 WLNR 171272; Martin Tankleff has pleaded not guilty and is being held in the Suffolk County Jail in lieu of $500,000 cash bail or $1 million bond.  *Seymour Tankleff Dies of Injuries*, 1988 WLNR 158438 (*See*, **Exhibit J**).

Dominic isn't charged with murder, and individuals around this Country, charged with more serious crimes are granted bail.

The defendant states the following in support of this request.

## I.  __INTRODUCTION__

1.   Mr. Pezzola now moves for Bail for the following reasons: (1) his treatment in a DC jail has violated his human rights, (2) his right to effective assistance of counsel is being deprived on a daily basis because he is unable to speak to his attorney's in a confidential setting, and participate in his own defense because he cannot adequately review the discovery in this matter; (3) the presumption against bail for pretrial detainees.

2.   As we have stated, *ad nauseum*, the events that took place on January 6, 2021, did not occur in a vacuum.

3.   The government is unable to prove that Pezzola (hereafter referred to as "Dominic", "Dom", or "Mr. Pezzola") is a flight risk by a preponderance of the evidence[2]; and instead, this case boils down to dangerousness, and whether the government can demonstrate that Dominic should be detained pretrial because there are "no condition or combination of conditions will

---

[2] Dom has lived in the same home for approximately 20 years.  When he was apprehended, he was in his own home.

reasonably assure the appearance of the person as required and the safety of any other person and the community". 18 U.S.C. § 3142(e)(1).[3]

## II.   **PROCEDURAL HISTORY**

4.   Additionally, the government cannot demonstrate that no "reasonable condition, or combination of conditions exist that would ensure Dom's return to court or the safety of all members of the community."

5.   Dom does not have access to all the discovery in this matter and has no guarantee that every time his name comes up in the jail that he wont be harassed and used as a scapegoat inmate to raise false disciplinary charges against him to throw Dom in the box.

6.   Dom has been moved from regular housing to the hole (aka, the box or special housing unit).  Each time this has occurred, there wasn't reasonable penological reason other than as a form of retaliation and/or harassment.

7.   Individuals who are housed in the D.C. Jail, who are accused of committing crimes on January 6, 2021, at The Capitol are treated differently than all other prisoners who are housed in the jail.  There is a clear deprivation of Equal

---

[3] *See also United States v. Munchel*, 2021 WL 1149196, at 4 (D.C. Cir. Mar. 26, 2021) (*quoting* 18 U.S.C. § 3142(f)(highlighting that "[t]o justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community [which requires that defendant] poses a continued articulable threat to an individual or the community that cannot be sufficiently mitigated by release conditions.").

Protection under the law.  Many, including Dom, have suffered when the conditions of confinement are exposed publicly.[4]

8.     As background for this application, Magistrate Robin Meriweather, on February 15, 2021, found that:

> The following factual proffers persuaded the Court that release under strict conditions would unduly endanger the community: (1) Mr. Pezzola's alleged participation in a group discussion about plans to return to Washington D.C. with weapons, in which members asserted that they would have killed former Vice President Pence or any person they got their hands on; (2) the fact that law enforcement found a thumb drive[5] in Mr. Pezzola's house containing files that included instructions for making bombs, firearms, and poisons. Although no materials for making bombs or poisons are alleged to have been recovered, and the group's alleged plans to return to D.C. have not come to fruition, the potential for future violent conduct in support of overturning the election of President Biden is too great to be adequately mitigated by any release conditions.

(*See* ECF Doc. 18).

9.     Approximately a month after the February 15, 2021, Order, on or about March 16, 2021, the Honorable Timothy Kelly ruled as follows:

> The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption

---

[4] Recently, when Dom's wife was interviewed, within hours of the interview airing, Dom was harassed and retaliated against and thrown in the "box" for approximately two weeks without a single disciplinary charge.

[5] As of the filing of this application, there is no evidence that Dom opened any of the files on the thumb drive.

and the other factors discussed below, detention is warranted for the reasons summarized in Part III.

(*See* ECF Doc. 26).

10.  Part III, the analysis, and statement of the reasons for detention, then finds

that:

> After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven: By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.
> . . . .
>
> In addition to any findings made on the record at the hearing, the reasons for detention include the following: Weight of evidence against the defendant is strong Subject to lengthy period of incarceration if convicted.

(*See* ECF Doc. 26 at p. 2).

11.  Other reasons include the following finding:

> In sum, the proffered evidence shows that Pezzola came to Washington, D.C. as a key member of a broader conspiracy to effectively steal one of our Nation's crown jewels: the peaceful transfer of power. He then played a prominent role in using violence to achieve those ends by, among other things, robbing a police officer of his or her riot shield and breaking a window of the Capitol to allow rioters to enter. Because of all that, he is charged with very serious crimes that subject him to very serious penalties. Thus, the nature and circumstances of the offense show a clear disregard for the law and the Constitution. More than that, though, theyshow a willingness to use violence

and to act in concert with others to obstruct essential functions of the United States government. And Pezzola's refusal to obey the lawful orders of law enforcement throughout the day suggest that he would not comply with conditions of release to keep the public safe. This factor weighs very strongly in favor of detention.

(*See* ECF Doc. 25 at p. 15).

12.   Footnote two (2) of the March 16, 2021, order highlights:

The government does not press the argument that Pezzola is a flight risk very far, and like Judge Meriweather, this Court does not find it persuasive. The Court does not order that Pezzola be detained for this reason.

(*See* ECF Doc. 25 at p. 12).

13.   Obviously, during the last 150 days of Pezzola's incarceration, ***Point One*** of February 15, 2021 Order has been obviated, where Dom if released cannot possess, legally or illegally a firearm or other weapon, and his every movement can be monitored to the extent of house arrest. He also can be precluded from even speaking to all other people besides his family and attorneys.

14.   ***Point Two*** is now moot as well, "as the potential for future violent conduct in support of overturning the election of President Biden is too great to be adequately mitigated by any release conditions" should no longer be of concern to the government with respect to Mr. Pezzola.  (*See* ECF Doc. 18).

15.   Dom Pezzola currently remains in the D.C. jail, and for five months has

literally been in his cell for 22 or 23 hours a day. He has very little privileged communications with his attorneys and cannot possibly review all of the video and audio discovery that in this matter.   When the undersigned counsel visited Dom, the setup of the visiting area exposed counsel and Dom to have every word of their conversation overheard by anyone around.[6]

## III.   <u>APPLICABLE LAW</u>

16.   A circumstance in point, which allows for a Defendant, under the nature of these charge to be granted pre-trial release, is Dom's co-defendant, William Pepe.[7] Dom's Co-Defendant Pepe was granted "a personal recognizance bond" on January 22, 2021. (*See* ECF Doc. 5-1).   U.S. Magistrate Judge G. Michael Harvey ordered Pepe released under the conditions that he must:

> (1) not violate federal, state, or local law while on release;
>
> (2) cooperate in the collection of a DNA sample if it is authorized by 42 U.S.C. § 14135a;
>
> (3) advise the court or the pretrial services office or supervising officer in writing before making any change of residence or telephone number;

---

[6] The day that the undersigned visited with Dom, another lawyer was sitting 2 spots down and we were able to hear everything she was telling her client.  Every word the client was saying to the lawyer, Dom could hear.

[7] In the original indictment Pezzola was charged in counts 1-11, and Pepe was charges in counts 1,2,8, and 9. In the superseding indictment, Pezzola was charged in counts 1-10, and Pepe was charges in counts 1, 2, 3, 6, 7, 8, and 9.

(4) appear in court as required and, if convicted, must
surrender as directed to serve a sentence that the court
may impose;

(5) abide by the following restrictions on personal
association, residence, or travel: stay out of WDC except
for Court & PSA business and attorney meetings;

(6) abide by additional travel restrictions such as: Travel
outside continental United States to be approved by the
Court. Def must notify PSA of travel outside state of
New York. Do not illegally possess firearms. . . .

(*See* ECF Doc. 5-Main).

17.    In the recent case of the *United States v. Klein*, U.S. District Court Judge John

D. Bates, granted pretrial release to the Defendant, who was also charged

with crimes related to the events of January 6, 2021.[8]  The *Klein* Court[9] laid

out the legal standard for pretrial release as follows:

> To assess a defendant's dangerousness, the court must
> "take into account the available information" concerning
> four statutory factors: (1) "the nature and circumstances
> of the offense charged," (2) "the weight of the evidence
> against the person," (3) "the history and characteristics of
> the person," and (4) "the nature and seriousness of the

---

[8] *See United States v Frederico Guillermo Klein,* 2021 WL 1377128 (*citing United States v. Chrestman,* 2021 WL 765662 (D.D.C February 26, 2021)).

[9] While inside the tunnel, Klein repeatedly placed himself at the front of the mob and used force against several officers in an effort to breach the Capitol entrance and maintain the mob's position. *Id.* at 5–10. He ignored several verbal commands by officers to "back up" and "[l]et it go now." *Id.* at 6. And twice he can be heard calling to the crowd behind him: "We need fresh people, we need fresh people." *Id.* at 8. Around 2:55 p.m., Klein bent down to pick up a flagpole, which lay at the foot of the police line, and passed it back to other rioters. *Id.* at 6; Rough Tr. of Hr'g (Apr. 9, 2021) ("Hr'g Tr.") 28:22–24.*United States v. Klein*, CR 21-236 (JDB), 2021 WL 1377128, at *1 (D.D.C. Apr. 12, 2021).

danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4). As the D.C. Circuit recently stated in <u>United States v. Munchel</u>, "[t]o justify detention on the basis of dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" 2021 WL 1149196, at *4 (D.C. Cir. Mar. 26, 2021) (quoting 18 U.S.C. § 3142(f)). That requires the government to establish that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. <u>Id.</u> (quoting <u>Salerno</u>, 481 U.S. at 751); <u>see also</u> <u>id.</u> ("[A] defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety."). Furthermore, "[d]etention cannot be based on a finding that defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness ... [as] otherwise the scope of detention would extend beyond the limits set by Congress." <u>Id.</u> at *7; <u>see also</u> <u>Salerno</u>, 481 U.S. at 746 ("[P]retrial detention under the Bail Reform Act is regulatory, not penal.").[10]

18.    In a detailed decision issued March 26, 2021, the *Munchel* Court, highlighted how "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021), *judgment entered*, 844 Fed. Appx. 373 (D.C. 2021) (*citing United States v. Salerno*, 481 U.S. 739, 755 (1987)).

---

[10] *Id.*

19. The Bail Reform Act of 1984 authorizes the detention of defendants awaiting trial on a federal offense only under certain, limited circumstances. 18 U.S.C. § 3142(f). Specifically, the court "shall order" a defendant detained before trial if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021), *judgment entered,* 844 Fed. Appx. 373 (D.C. Cir. 2021)(*citing* 18 U.S.C. § 3142(e)); *see also* 18 U.S.C. § 3142(f). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.' " *Id.* (*quoting United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)).

20. There are two types of situations in which the Bail Reform Act establishes a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community.  18 U.S.C. § 3142(e). First, a rebuttable presumption arises if the judicial officer finds that (a) the person has been convicted of certain listed federal offenses, including a "crime of violence," or similar state offenses, (b) that offense was committed while the person was on release pending trial for another offense, and (c) not more than five years has elapsed since the date of conviction of

that offense or the release from imprisonment, whichever is later. 18 U.S.C. § 3142(e)(2).

21. Where there is no rebuttable presumption of detention, the court instead must consider the following factors to determine whether there are conditions that would reasonably assure the defendant's appearance and the public's safety:

1. the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

2. the weight of the evidence against the person;

3. the history and characteristics of the person, such as character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, drug or alcohol abuse, criminal history, and warrant history;

4. whether, at the time of arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and

5. the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

(18 U.S.C. § 3142(g)(1) – (4); *United States v. Chansley*, No. 21-CR-3 (RCL), 2021).

22. As the *Munchel* Court highlighted:

> To justify detention on the basis of dangerousness, the government must prove by "clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." Id. § 3142(f). Thus, a defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety.

*United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021), *judgment entered,* 844 Fed. Appx. 373 (D.C. Cir. 2021).

23.   In citing *Salerno*, the *Munchel* Court explained how:

> the Supreme Court rejected a challenge to this preventive detention scheme as repugnant to due process and the presumption of innocence, holding that "[w]hen the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that, consistent with the Due Process Clause, a court may disable the arrestee from executing that threat.

*United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), *judgment entered,* 844 Fed. Appx. 373 (D.C. Cir. 2021) (*quoting United States v. Salerno*, 481 U.S. 739, 751 (1987) (emphasis added)).

24.   If the Bail Reform Act authorizes pre-trial detention, the judicial officer must

hold a hearing[11] to determine whether there are conditions of release that

would reasonably assure the appearance of the defendant as required and the

safety of any other person and the community. *See* § 3142(f). If the judicial

---

[11] The undersigned counsel respectfully requests a hearing on this matter, where testimony, if necessary, and arguments are permitted.

officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer *shall* order the person detained pending trial. § 3142(e)(1). A finding that no condition or combination of conditions would reasonably assure the safety of any other person and the community must be supported by clear and convincing evidence. § 3142(f). And a finding that no conditions would reasonably assure the defendant's appearance as required must be supported by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

25.   As will be demonstrated, the Government cannot establish that Pezzola poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), *judgment entered*, 844 Fed. Appx. 373 (D.C. 2021) (quoting 18 U.S.C. § 3142(f)). (*quoting Salerno*, 481 U.S. at 751).

## IV.   <u>ARGUMENTS</u>

### <u>POINT ONE</u>

### THE CONSTITUTIONAL RIGHT TO ASSISTANT IN ONE'S DEFENSE AND SUPPLEMENT IF NECESSARY.

26.   Defendant Pezzola, hereby through his counsel, respectfully reserves and preserves his right to make further submissions on this issue of because of

counsel's inability to adequately communicate with Pezzola in a confidential setting.

27.  Every Defendant has, at a minimum, the right to counsel. Such a right includes, but is not limited to, confidential communications with their counsel in person, by mail and via phone calls.[12]

28.  In this case, our client, Defendant Pezzola's right to communicate with his counsel has been severally infringed.

29.  In *McKaskle*, the U.S. Supreme Court highlighted:

> In *Faretta* the Court considered the case of a criminal defendant who was required to present his defense exclusively through counsel. The Court held that an accused has a Sixth Amendment right to conduct his own defense, provided only that he knowingly and intelligently forgoes his right to counsel and that he is able and willing to abide by rules of procedure and courtroom protocol. *Faretta* concluded that "[u]nless the accused has acquiesced in [representation through counsel], the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense." 422 U.S., at 821, 95 S.Ct., at 2534.
>
> *Faretta* 's holding was based on the long-standing recognition of a right of self-representation in federal and most state courts, and on the language, structure, and spirit of the Sixth Amendment. Under that Amendment, it is the accused, not counsel, who must be "informed of the nature

---

[12] On another note, during the course of a separate litigation in our firm, we recently learned that attorney-client phone calls were recorded and turned over to prosecutors in New York City, and if it easily happens in the big apple then it can happen anywhere in the country. *See* https://www.nydailynews.com/new-york/ny-jails-recordings-attorney-client-privilege-calls-20210321-tzbyxwnle5dc5jgvi5cona6wry-story.html; https://www.nydailynews.com/new-york/ny-rikers-jail-phone-records-lawyers-inmates-20210320-rdfb2lmuevgsdg5npad4egoqai-story.html.

and cause of the accusation," who has the right to confront witnesses, and who must be accorded "compulsory process for obtaining witnesses in his favor." The Counsel Clause itself, which permits the accused "to have the Assistance of Counsel for his defense," implies a right in the defendant to conduct his own defense, with *assistance* at what, after all, is his, not counsel's trial.

*McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 949 (1984).

30.  The *McKaskle* principles remain the same to every one of these January 6, 2021, Defendants.

31.  However, the pretrial conditions of the DC jail have created an environment where these Defendants, especially Defendant Pezzola are unable to assist in their own defense and thus are not ensured effective assistance of counsel.

32.   An example of daily harassment to others is another one of our clients, Edward Jacob Lang, an observant Jew, is now labeled as a "false prophet" among the DC guards simply because he has prayed for other inmates.

33.  This smaller group of inmates housed at the DC jail have it bad, where those awaiting trial for alleged crimes in the Jan. 6 Capitol riot. They have been placed in "restrictive housing," a maximum-security designation.

34.  Regarding this "restrictive housing" definition, one reporter noted how:

Solitary confinement is a form of punishment that is cruel and psychologically damaging," Warren told Politico a month later. The Massachusetts Democrat fears the Jan. 6 defendants are being singled out to "punish" them or "break them so that they will cooperate" with federal prosecutors.

> Durbin was surprised to learn about the restrictive housing. It should be a "rare exception" with a "clear justification," the Illinois Democrat told the news outlet, to be used in "very limited circumstances."
>
> Staff for Durbin, who chairs the Senate Judiciary Committee, and Warren, a member of the Senate Democratic leadership, did not respond to queries for an update on their efforts to get better treatment for the Jan. 6 defendants.

GREG PIPER, *D.C. Jail Treatment of Capitol Riot Defendants Draws Bipartisan Outrage*, Just the News, Updated May 10, 2021, *available at* https://justthenews.com/government/local/dc-jail-treatment-capitol-riot-defendants-draws-bipartisan-outrage.

35.   The plight of nearby inmates has received surprisingly little attention on Capitol Hill for the better part of a year, since the District of Columbia Department of Corrections issued its "medical stay-in-place" policies for COVID-19 mitigation.

36.   It is impossible to have a free-flowing conversation with Defendant Pezzola.

37.   Attorney-client meetings are in open cages where there is no confidentiality, everyone can hear the conversations including prison guards.  Undersigned counsel experienced this when they visited with Dom at the D.C. Jail.

38.   Contact legal visits, where a defendant meets with his lawyer in person at the jail, require the Defendant to then quarantine for 14 days. This was specifically told to undersigned counsel by several staff when visiting Defendants Pezzola.

39. Essentially, the Attorney-client privilege is nonexistent, depriving Dom of his fundamental constitutional right to counsel.

40. Considering the conditions that Dom is housed in, and the manner in which legal visits are conducted, there is the strong likelihood that the Government is intruding on the attorney-client privilege.

41. Courts have held that when a prosecution knowingly arranges or permits intrusion into the attorney-client relationship, the right to counsel is sufficiently endangered to require reversal and a new trial. Lower Courts make prejudice the linchpin for invalidating a conviction. Courts require, first, whether the prosecution deliberately intruded into the Counsel's defense. *Shillinger v. Haworth*, 70 F. 3d 1132 (10th Cir. 1995) (highlighting "a deliberate attempt by prosecution to obtain defense strategy information or to otherwise interfere with the attorney-defendant relationship through the use of an undercover agent may constitute a per se violation of the 6th amendment").

42. If confidential information is disclosed, many courts ordinarily do not try to weigh the amount of prejudice, but instead, invalidate the conviction. *U.S. v. Levy*, 577 F. 2d. 200 (3rd Cir. 1978); *U.S. v. Kembler*, 648 F 2d. 1354 (D.C. Cir 1980). The extreme difficulty of measuring such hypothetical prejudice has been noted. *See Weatherford v. Bursyey*, 429 U.S. 545, 97 S ct. 837, SI L Ed. 2d

30 (1977); Additionally, Courts will dismiss the indictment. *U.S. v. Orman*, 417 F. Supp 1126 (1) Col. (1976); *Barber v. Municipal Court*, 24 Cal 3d 742, 157 cal. Rptr. 658, 598 P. 2d. 1131 (6th Cir. 1978) *judgment vacated*, 459 U.S. 810, 103 S. Ct. 34, 74 L. Ed. 2d 47 (1982).

43. Even when information is not disclosed and no prejudice is shown, gross prosecutorial misconduct according to some courts, may result in reversal or dismissal. *Shillinger v. Haworth*, 70 F 3d 1132 (10th Cir. 1995); *US. v. Davis*, 646 F. 2d 1298, 1303 n. 8 (8th Cir. 1981); *State of S.D.V. Long*, 465 F. 2d 65 (8th Cir 1972); *State v. Quattlebaum*, 338 S.C. 441, 527 S.E. 2d 105 (2000).

44. In *Quattlebaum*, the Court disqualified the entire prosecutor's office after a deputy prosecutor eavesdropped on private conversations between an attorney and his client. According to the court, "[t]he sanction of disqualification was necessary to protect the integrity of the judicial system, whose reputation was called into question by the prosecutor's reprehensible act". *Id.*   [Quattlebaum] was convicted of murder, first degree burglary, armed robbery, assault and battery with intent to kill, and possession of a firearm during the commission of a violent crime. [Quattlebaum] was [then] sentenced to death." *State v. Quattlebaum*, 338 S.C. 441, 444, 527 S.E.2d 105, 106 (2000).

45. Finally, in light of the Supreme Court directives, "that remedies should be tailored to the injury suffered, "the remedy that the Cd's containing privileged confidential defendant-attorney conversations along with other non-confidential conversations must be handed over to defense counsel, the only one legally eligible to listen to all conversations. He should then select all calls supporting ineffective claims and supporting conversations of abuse and claims, and then submit such to the court. *Shillenger v. Haworth*, 70 F. 3d 1132 (10th Cir. 1995); *US. v. Solomon*, 679 F 2d 1246 (8th Cir 1982).

46. For example, in *In re Myers* the Supreme Court noted that the Solicitor's role in determining a criminal's fate subjects him to the highest ethical standards. *In re Myers*, 355 S.C. 1, 10-11, 584 S.E.2d 357, 362 (2003). This elevated ethical obligation requires the implementation and management of a system designed to effectively "supervise his deputies so that when he discovers that they may be violating a Rule of Professional Conduct, he can immediately ameliorate any prejudicial effect that the violation may have on the defense." *Id.* (emphasis added). "This suggests that satisfaction of the corrective duty may be dependent on the success of the preventive duty; if there is an adequate supervisory system in place, notice of any SCRPC violation will be recognized quickly enough to mitigate any damage. . . .Furthermore, failure to satisfy either of the two duties imposed by Rule 5.1 may have drastic and

unintended effects.

47. For example, had *Myers* satisfied his corrective duty as a supervisory lawyer by informing defense counsel of the eavesdropped conversation shortly after he received knowledge of it, *Quattlebaum's* conviction might not have been overturned." SARAH THERESA EIBLING, *Duties and Responsibilities of Lawyers in Light of In Re Myers: Are you Aware?*, 55 South. Car. Law. Rev., 559 (2004). The government has created an untenable environment whereby we believe there is the likelihood of an intrusion into the attorney-client privilege.  How can we trust the government if we cannot communicate with our own clients at the jail or over the phone in a confidential manner.  Something must be done here to ensure that we can have privileged communications with our client – such as granting of bail.

## POINT TWO

### DEFENDANT'S NEED FOR ACCESS TO A LAPTOP AS ALTERNATIVE RELIEF.

48. Every defendant has the right to review discovery materials in their own case, especially, January 6, 2021, Defendants as the Government has deemed these cases part of the largest criminal investigation and prosecution in US history.

49. Defendant Pezzola is entitled to review every document, video, audio, and anything else that the FBI, Department of Justice, United States Attorney's

Office, or any other agency obtaining or generating video or audio materials.

Such a review must not be dictated on whether his attorneys can visit him.

No such burden should be placed on counsel or corrections, especially

considering the financial and time-consuming burden it would place if

undersigned counsel were required to sit with Dom at the jail and review

each and every video.

50. "[I]n the usual case when production is ordered, a client has the right to see

and know what has been produced." *See, e.g., Geders v. United States*, 425 U.S.

80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Faretta v. California*, 422 U.S. 806,

95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *United States v. Truong Dinh Hung*, 667

F.2d 1105, 1108 (4th Cir. 1981).

51. Failure to review discovery with Dom can rise to the level of ineffective

assistance of counsel since a "defendant generally has a right to review the

discovery materials that will be used against him at trial, *United States v.*

*Hung,* 667 F.2d 1105, 1108 (4th Cir.1981)," *Johnson v. United States*, 2:07-CR-

00924-DCN-3, 2014 WL 295157, at 5 (D.S.C. Jan. 27, 2014).

52. Therefore, alternatively, Mr. Pezzola should be provided a laptop where he

can view all the evidence that will be used against him:

    a.  All written discovery provided by the Government;
    b.  All audio and video discovery provided by the
        government;
    c.  The ability to email and receive emails from his attorneys;

    d.   The ability to generate notes, documents, and other relevant materials to aid in his own defense; and

    e.   A guarantee that no one shall access the laptop in an effort to gain access to attorney client privileged materials.

53.   Applications for accessibility for a laptop for pre-trial detainees is regularly granted around the country, and in some jurisdictions, there are specific policies in place:

    a.   In *United States v. Helbrans*, 7:19cr497 (NSR), a Southern District of New York Case, an application was made for the defendant to have access to a laptop and internet so that the defendant may prepare his defense, which was granted (*See* **Exhibit A**);

    b.   In *United States v. Reid, et al, including Brandon Nieves*, a Southern District of New York case, an application was made for the defendant to have access to a laptop "to permit clients to review large amounts of discovery in the case. Judge Halpern, granted the application. (*See* **Exhibit B**);

    c.   Attached as **Exhibit C**, is a sample order by Judge Denise Cote of the Southern District of New York, granting a defendant the right to have access to a laptop computer and email access to communicate with his attorneys;

    d.   In *United States v. Ghislaine Maxwell*, 20 Cr. 330 (AJN), a Southern District of New York case, an application was made to give the defendant access to a laptop computer to review the discovery in the case. The Court granted the request. In light of the Court order, defendant has access to her laptop 13 hours a day, 7 days a week. (*See* **Exhibit D**);

e.   In *United States v. Washington*, 20 CR 30015, a Central District of Illinois case, an application was made for access to a laptop was granted.  (*See* **Exhibit E**);

f.   In the United States District Court for the Northern District of California, San Francisco Division, the Court has in place a Proposed Order Re Use of Digital Tablet in Custody to allow defendants to review discovery in their cases.  (*See* **Exhibit F**);

g.   The CJA Panel, that represents prisoners housed in the Santa Rita County Jail, have issued a memo, "CJA Panel – Tablets and accessories to enable clients to access e-discovery at Santa Rita Jail."  (*See* Exhibit G);

h.   The Joint Electronic Technology Working Group issued a report *Guidance for the Provision of ESI to Detainees* on October 25, 2016.  (*See* **Exhibit H**)  A specific issue raised and addressed by the report was, "[a] represented defendant who is detailed  pending trial must generally have the opportunity to personally review some or all of the discovery and disclosure, which is now commonly in ESI format." (Report at 2);

i.   The District of Columbia, Department of Corrections, as a policy titled **Access to Legal Counsel**, attached as **Exhibit I**.  Therein, there is a policy whereby prisoners are able to review discovery on a laptop, however, the policy on it's face has the potential to invade attorney-client privilege.  **Attachment C**.  Further, the alternative policy, identified in **Attachment D**, punishes prisoners who opt to participate in the alternative Surveillance/Voluminous Documents Review Program by moving their housing location and putting them in restrictive housing; and

j.   In this case, a better alternative to granting Defendant with a laptop will be to grant bail.  If Bail isn't granted, there are concerns that the DC jail will not comply with

> Court orders and will invade the defendant's attorney-
> clients privilege.

54. When "Asked about Jan. 6 defendants specifically, Comer's office provided Just the News a statement Friday night. 'Reports that January 6 defendants, who have been charged but not yet convicted of a crime, [are] receiving even harsher treatment is equally appalling,' he said." GREG PIPER, *D.C. Jail Treatment of Capitol Riot Defendants Draws Bipartisan Outrage*, Just the News, Updated May 10, 2021, *available at* https://justthenews.com/government/local/dc-jail-treatment-capitol-riot-defendants-draws-bipartisan-outrage.

55. "Your ability to participate in your own defense" is not available to these clients, which is an obvious ground for appeal, he added.

56. The design of D.C. inmate facilities also makes confidentiality functionally impossible, according to Tankleff. "There isn't even a solid wall" in the space where attorneys meet with clients, he explained. Two cubicles down from one meeting, "we heard everything" another lawyer was saying, he recalled.

57. It's highly suspicious why the defendants arrested elsewhere have to be sent to D.C. when all their hearings are virtual by default, he said: "What was the purpose of transferring them?"

## POINT THREE

## DC JAIL: HUMAN RIGHT VIOLATIONS, ON A DAILY BASIS

58. The jail allows prisoners to leave their cells from anywhere from an hour a day to a few hours a day.

59. Religious services are not allowed.  Dozens of prisoners have to share the same fingernail/toenail cutter, without it being disinfected between each use.

60. Exercise, especially outdoor access is limited or non-existent.  Under the restrictive housing conditions, exercise is limited, whereas others in the jail have more ability to exercise.

61. Access to personal hygiene such as showers is nearly nonexistent, according to our client, and defense lawyers and relatives I've spoken with.  Those housed in general population are able to take a shower whenever they want. The same can be said for those seeking a haircut – every person we have spoken to has stated that they have been denied a haircut since their imprisonment commenced at the DC Jail.

62. Those in general population vs. restrictive housing have more chances to wash their clothing.

63. Those in general population have the ability to either visit the law library or gain more materials than those being housed in restrictive housing.

64.   The detainees, before a single moment of their trial has begun, suffer the same harsh treatment as convicted criminals incarcerated in the D.C. prison system—pandemic-justified conditions recently condemned by elected officials of both parties.

65.   The treatment is so bad that the detainees have found advocates in two unlikely allies: Senators Elizabeth Warren (D-Mass.) and Richard Durbin (D-Ill.). "Solitary confinement is a form of punishment that is cruel and psychologically damaging," Warren told *Politico* last month. "And we're talking about people who haven't been convicted of anything yet." Durbin expressed surprise at how the January 6 detainees were being held and urged progressives to "amplify their criminal justice reform calls even on behalf of Donald Trump supporters who besieged the entire legislative branch in January."[13]

66.   The issues of confinement have are so widespread that politicians are conducting ongoing investigations into this matter.  Undesigned counsel has spoken to members on the Hill.  Worse though is that when the press covers these issues, prisoners, such as Dom are retaliated within 48 hours of a newspaper article or television report airing.

---

[13] Congresswoman Marjorie Taylor Greene stated in her letter, "The treatment at these facilities is so bad that both Republicans and Democrats have called for change.  Senator Elizabeth Warren told reporters that 'Solitary confinement is a form of punishment that is cruel and psychologically damaging.'"  (**Exhibit L** at pg. 2)

67.   On June 24, 2021, Marjorie Taylor Greene, a member of Congress sent a letter to: Christopher Wray, Direct of the FBI; Yogananda D. Pittman, Acting Chief of the US Capitol Police; and cc'd Muriel Bowser, Mayor of DC and Michael Carvajal, the Director of the Federal Bureau of Prisons. (*See*, **Exhibit L**).

68.   In the Congresswoman's letter, she raised the following concerns of how people like our clients are being treated in custody:

   a.  Visitation hours;

   b.  Access to religious texts and reasonable religious service accommodations;

   c.  Access to exercise;

   d.  Portion of time in lockdown, solitary confinement;

   e.  Nutritional content – including number of daily meals – compared with the general population;

   f.  Access to communication with family and attorneys; and

   g.  Whether the prosecution made potentially exculpatory evidence available to the appropriate defense counsels of record.

69.   In the letter, the Congresswoman stated some other facts, which echo exactly what our clients have conveyed to us:

   a.  "[T]he accused protestors from January 6 are being abused behind bards and denied their constitutional rights";

b. "There is substantial evidence that the accused of January 6 face inhumane detention conditions"; and

c. "One man was beaten so badly that he has a skull fracture and is now blind in one eye."

70. The caselaw regarding the denial of human rights, especially for those housed as a pretrial detain, favor Dominic's application for bail.  If the conditions have only worsened over the past several months, there is no likelihood that they will get better, and the longer that Dom is imprisoned, the more serious the violations rise to.

71. In the past, the DC jail was found to be overcrowded, without proper care for inmates with psychiatric problems, lacking in recreation opportunities, having overly restrictive visitation rights along with generally unsafe and unsanitary conditions. Judge Bryant also ordered the defendant jail officials to initiate action to correct these violations. Judge Bryant extended many of the District Court's findings from *Campbell v. McGruder*, (JC-DC-001), which involved unconstitutional jail conditions for pre-trial detainees.

72. The D.C. District court has held, "with regard to the everyday administration of pretrial detention facilities, the Court is merely concerned with whether a "particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective"; if so, the detention facilities practice does not violate due process and thus should generally not concern the

court. *See Bell,* 441 U.S. at 548, 99 S.Ct. 1861 ("[T]he operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."). *United States v. Medina,* 628 F. Supp. 2d 52, 55 (D.D.C. 2009).

73. The Court in *Mednia,* supports the position that since the issues raised herein rise to the level of a Constitutional violation, this Court is empowered to grant relief.

74. There is no doubt that the Government will counter that Dominic should file a grievance to address the human rights issues that are violating his Constitutional rights on a daily basis. However, this court is empowered to eradicate those violations by granting bail.

### POINT FOUR

### THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, UNDER 18 U.S.C. 3142(G)(2).

75. In analyzing this first of the four Section 3142(g) statutory factors, "The Nature and Circumstances of the Defendant" the *Klein* court applied the following six subfactor analysis:

> These considerations include whether a defendant: (1) "has been charged with felony or misdemeanor offenses;" (2) "engaged in prior planning before arriving at the Capitol;" (3) carried or used a dangerous weapon during the riot; (4) "coordinat[ed] with other participants before, during, or after the riot;" or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging

other rioters' misconduct;" and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot."

*United States v Frederico Guillermo Klein,* 2021 WL 1377128 at p. 6.

76.   Here, regarding Dom, this Court's February 15 order states the following:

> Mr. Pezzola's charges arise from his alleged conduct as part of a large group of individuals who stormed the U.S. Capitol on January 6, 2021 while lawmakers were attempting to certify the 2020 election results. Mr. Pezzola was allegedly at the front of the group of people at various stages of the approach to the Capitol building.

> The United States further proffered that Mr. Pezzola stole a riot shield from a Capitol Police Officer and used it to break a window of the Capitol building, thereby allowing himself and countless others to gain entry into the building. The indictment also charges him with conspiring with other individuals regarding the charged crimes. The government also proffered that Mr. Pezzola took a video of himself in the Capitol building while smoking and stating that he knew the rioters would overtake the Capitol if they tried hard enough. A cooperating witness told law enforcement that Mr. Pezzola was part of a discussion among a group of people after the breach, in which group members stated that they would have killed anyone they came across and expressed an intent to return to Washington, D.C. Mr. Pezzola is charged with felony offenses, in contrast to individuals who are solely facing misdemeanor charges for entering the restricted areas at the Capitol. Indeed, Congress wrote into the Bail Reform Act a presumption of detention that is triggered when someone is charged with the destruction of property

offense charged in Mr. Pezzola's indictment. Therefore, this factor weighs in favor of pretrial detention.

. . . .

The defendant's dangerousness/risk of flight:

The danger posed by Mr. Pezzola's release is that he would engage in conduct similar to or worse than the charged offenses, specifically, attempting to thwart the democratic process by violent means or engaging in violence against government officials. Defense counsel denied any such Intent, and portrayed the charged conduct as aberrational. Nonetheless, the danger is sufficiently strong that this factor weighs in favor of pretrial detention. The Court considered whether strict release conditions, such as GPS monitoring and home confinement, could mitigate the dangerousness, but ultimately concluded that no conditions or combination of conditions could reasonably assure the safety of the community. The following factual proffers persuaded the Court that release under strict conditions would unduly endanger the community: (1) Mr. Pezzola's alleged participation in a group discussion about plans to return to Washington D.C. with weapons, in which members asserted that they would have killed former Vice President Pence or any person they got their hands on; (2) the fact that law enforcement found a thumb drive in Mr. Pezzola's house containing files that included instructions for making bombs, firearms, and poisons. Although no materials for making bombs or poisons are alleged to have been recovered, and the group's alleged plans to return to D.C. have not come to fruition, the potential for future violent conduct in support of overturning the election of President Biden is too great to be adequately mitigated by any release conditions.

(*See* ECF Doc. 18).

77. A circumstance in point, which allows for a Defendant, under the nature of these charge to be granted pre-trial release, is Dom's co-defendant, William Pepe. Dom's Co-Defendant Pepe was granted "a personal recognizance bond" on January 22, 2021. (*See* ECF Doc. 5-1).

78. In the original indictment Pezzola was charged in counts 1-11, and Pepe was charges in counts 1,2,8, and 9. In the superseding indictment, Pezzola was charged in counts 1-10, and Pepe was charges in counts 1, 2, 3, 6, 7, 8, and 9. (*See* Superseding Indictment at ECF Doc. 34).

79. Simply put, Dom is charged with three more counts than Co-Defendant Pepe, counts 4, 5, and 10.

80. Count 4 is a Robbery of personal Property of the United States under 18 U.S.C. § 2112.  This count specifically charges that Dom "by force and violence and by intimidation, did take and attempt to take, from the person and presence of a Capitol Police officer, personal property belonging to the United States, that is a riot shield." What continues to be forgotten about this day is that it was chaos and there were various points where Officers are seen pushing crowds away and down. During Officers pushing the crowds back or down stairs, officers happened to drop some of their belongings.

81. As a result, people who were there would then pick material up off the floor, such as shields that the officers dropped on the floor. That behavior is not

tantamount to or the equivalent to Dom taking the shield "by force and violence and by intimidation". The record here is devoid a showing supporting that Dom used any force or intimidation to obtain the shield that was dropped on the floor.

82. Count 5 is an Assaulting, Resisting, or Impeding certain Officers count, under 18 U.S.C. § 111(a)(1). This count alleges that with the intent to commit count 3 and 4 (discussed above about the shield), Dom "forcibly assault, resist, oppose, impede, intimidate, and interfere with, an officer and employee of the United States . . ." . This count fails to take into account the same exact thing as count 4, that this shield was picked up off the floor. That means that Dom never had any contact with any officers where he took the shield from the officer. Instead, an officer dropped his shield and Dom merely picked it up off the floor. There was not assault or intimidation that took place in order for Dom to obtain a shield. Rather, all the government can proof is that Dom ended up with the shield – that is it. Because he picked it up off the floor.

83. Count 10 is an Obstruction of law Enforcement during a Civil Disorder and Aiding and Abetting count, pursuant to 18 U.S.C. § 231(a)(3)(2). This count alleges that Dom obstructed, impeded, and interfered with a law enforcement officer, "that is E.G.", and in the commission of a civil disorder,

a "obstructed, delayed, and adversely affected the conduct and performance of a federally protected function." (*See* Superseding Indictment at ECF Doc. 34 at p. 15).  Defendant Michael Foy is charged with this same charge, and he was just released on bond despite being alleged to strike at law enforcement at least 10 times with a hockey stick before "rallying" others to climb through broken windows into the U.S. Capitol. (*See US v. Foy*, 1:21-cr-00108 (TSC) at ECF Doc. 46); 2021 WL 2778559, *United States of America v. Michael Joseph Foy,* Defendant, 21-CR-00108 (TSC), 2021 WL 2778559 (D.D.C. July 2, 2021)(**Attached as Exhibit K**).

84.   Dom, just like Michael Foy, is a U.S. Marine, with no disciplinary history, who is sitting in isolation in a D.C. Jail[14]. He has two young daughters and a wife at home, who all want Dom back at home even if it's during the pretrial stages of his case. His co-defendant was granted bond without a problem, and the only addition charges Dom has from his Co-Defendant are that he picked up an officer's shield off the floor, and that he "adversely affected the conduct and performance of a federally protected function".

85.  These three additional charges for Co-defendant Pepe- who is out on Bond-lack specificity and are not the types of crimes that support an individual

---

[14] "Foy, a former United States Marine with no prior criminal record," *United States of America v. Michael Joseph Foy,* Defendant., 21-CR-00108 (TSC), 2021 WL 2778559, at 1 (D.D.C. July 2, 2021).

being denied bond during his pre-trial stages of his case, especially when there is no light as to when these January 6th cases will actually go to trial.

86. These three additional charges from co-defendant Pepe do not establish that Dom is a flight risk or that he poses a dangerousness to the any member or part of the community. As the *Foy* Court highlighted "[i]n considering 'the nature and seriousness of the danger to any person or the community that would be posed by [Foy]'s release,' " 18 U.S.C. § 3142(g)(4), the court is mindful of the D.C. Circuit's caution that a future threat must be "clearly identified" for pretrial detention to be justified, particularly given that "the specific circumstances of January 6 have passed." (*See United States of America v. Michael Joseph Foy*, Defendant., 21-CR-00108 (TSC), 2021 WL 2778559, at p. 5 (D.D.C. July 2, 2021) (*citing Munchel*, 991 F.3d at 1283–84).

87. Dominic Pezzola, even assuming *arguendo*, that every allegation the government has put forward is true, there is no evidence that Dom is a "flight risk" or a "danger to the community," a community he, his wife and children have lived in for over 20 years. *United States of America v. Michael Joseph Joy*, Defendant, 21-CR-00108 (TSC), 2021 WL 2778559, at p. 2 (D.D.C. July 2, 2021).

## POINT FIVE

### HISTORY AND CHARACTERISTICS OF MR. PEZZOLA, UNDER 18 U.S.C. § 3142(G)(3).

88. Dom is a 43-year-old and has no prior criminal record, is a Veteran, lives with his wife and children, and owns a business through which he employs a number of people. Those who know Dom and love him desperately want him back home. Those who have worked with Dom know his skills and work product, and one company, in particular, has indicated to the undersigned that if Dom were to be released tomorrow that he would be employed with jobs every single day for at least the next year.

89. Dom was not a leader during the events at the Capitol; and is not accused of directing people to engage in illegal conduct.

90. Dom's ties to his community are strong. He has personal relationships with members of the local business community, law enforcement, friends, and family. He has no criminal history and is not on probation or parole.[15] He has never forged or altered his identification. Nothing about his past or current history supports the conclusion that he is dangerous to anyone, a risk

---

[15] "Foy's 'history and characteristics' tip the scales—just barely—in favor of his release." *See* 18 U.S.C. § 3142(g)(3). Foy, who has no prior criminal record, was honorably discharged from the United States Marine Corps in June of 2020, after approximately five years of service, and had been living with family members in their Michigan home throughout the pandemic." *Id*.; *U.S. v. Foy*, 21-CR-00108 (TSC), 2021 WL 2778559, at p. 4 (D.D.C. July 2, 2021).

of flight, and/or incapable of complying with court-imposed restrictions designed to assure his return to court and protect the community from future harm.

91.  In applying 18 U.S.C. Section 3142(g)(3) to the above-mentioned facts to Dom's life, the only reasonably conclusion is that such factors weigh in favor of pretrial release.

92.  As argued above, Dom has *no criminal history whatsoever*, and a strong personal history in terms of finding favorability under the Bail Reform Act.

93.  In a February 15, 2021, order denying Dom's bail, Magistrate Robin Meriweather, even found that:

> The defendant's history and characteristics, including criminal history:
>
> Mr. Pezzola's history and characteristics weigh in favor of pretrial release. He is 43 years old and has no prior criminal history. He is also self-employed and a Marine Corps veteran. In addition, Mr. Pezzola has strong family ties to his hometown where he still resides and lives with his wife and children. Indeed, his history and characteristics favor release strongly enough to rebut the presumption of detention.
>
> . . . .
>
> Mr. Pezzola also disputed the government's allegation that he poses a serious risk of flight. He highlighted that he voluntarily surrendered himself to police, essentially all of his ties are to his hometown, he did not significantly alter his appearance as argued by the government, and his wife would be an excellent third-party custodian because she

was previously employed as a Pretrial Release Supervisor
in New York.

(*See* ECF Doc. 18).

89. The government cannot provide evidence of a specific articulated threat to the community, or a risk of danger to any specific person. Consequently, Dom respectfully asks this Court to grant him pretrial release under the above cited line of cases in *Munchel, Klein, Norwood,* and *Foy,* and other recent precedent out of the D.C. Circuit Court and D.C. District Courts, regarding the release of persons accused of crimes related to the January 6, 2021, incident at the United States Capitol.

90. Dom's personal history, community ties, and lack of criminal history are more than sufficient proof to rebut any presumption of detention.  Because of this, Dom should be released from the dangerous conditions of punishment he is experiencing in the DC Central Detention Facility.[16] He has no warrant history and has never forged or altered his identification. Nothing about his past or current history supports the conclusion that he is dangerous to anyone, a risk of flight, and/or incapable of complying with court-imposed restrictions designed to assure his return to court and protect the community from future harm.

---

[16] *See* Politico's article on the horrific conditions of confinement at the DC Detention Facility where our client is being detained, available at, *https://www.politico.com/amp/news/2021/04/06/capitol-riot-defendant-beating-guards-479413*, (last visited April 16, 2021).

91.    The law mandates Dom's release, because the government cannot prove by a preponderance of the evidence that Dom poses a risk of flight, and the government has not proven by clear and convincing evidence that Dom poses a danger to the community.   Moreover, the offenses charged do not qualify for detention. Without question, a combination of conditions, including GPS monitoring, will reasonably ensure his appearance in court, and the safety of the community.   Because the events that took place at the Capitol on January 6, 2021, are unique to that day and not indicative of a future event, Dom poses no ongoing fear or threat. Release was properly decided and requires deference under the meaning of the Federal Magistrates Act.   This Court's original decision to grant the government's motion for pretrial detention, is out of line with relevant legal precedent, and is violative of the United States Constitution.

92.    Overall, the *Duke-Robinson-Mattis-Munchel-Foy*, line of cases, clearly establish the continued enforceability of the Bail Reform Act's presumption against pretrial detention.   Especially, during circumstances where in can be reasonably inferred that a person's actions arise from an ardent desire to openly criticize the actions of government.   The Court's granting of the government's motion for against pretrial release, when viewed in light of the *Duke-Robinson-Mattis-Munchel-Foy*, is grossly unjust because the objective facts

regarding Dom's personal history, and lack of criminal record have counted for nothing.  While a meritless concoction of unfounded allegations was weighed against him despite the fact that he was never arrested or given the opportunity to confront his alleged accuser in court.  These unfounded allegations are then intentionally comingled with the violent actions of others, to suggest that Dom was violent, incited violence, planned violence, is violent, lead violence, when in fact there is no evidence of violence whatsoever.

93. The events that took place at the Capitol on January 6, 2021, are unique to that day and not indicative of a future ongoing danger or threat.  For instance, the "Stop the Steal" rally, referred the belief that the November 2020 United States Presidential Election was at best incorrectly decided and at worst stolen from the people, by a government conspiring against the people, and that if enough people showed up to express their belief about this wrongdoing- Joe Biden would not be confirmed as the 46th President of The United States.  Clearly, that did not happen and any worry over Biden's confirmation moot, as he is now our President.  Therefore, the argument that an ongoing future threat abides is diminished to the extent that it does not meet the threshold of clear and convincing evidence.

94.   The government has failed to prove dangerousness by clear and convincing evidence because it has not identified at least one specific articulable threat to the safety on any individual or community stemming from PEZZOLA's prospective release on bail. Neither has there been an adequate demonstration that the crimes under which he has been charged qualify as violent under the meaning of the Bail Reform Act.  Nor has there been any indication that his lack of criminal history, home life, employment history, community ties, or the fact that he self-surrendered were properly balanced against the allegations to which he has been charged.

95.   When one, first, analyses the totality of circumstance of PEZZOLA's case, under the lens of precedent set forth in the *Duke-Robinson-Mattis-Munchel-Foy, et al.*, line of cases; and second, applies said precedent to the facts of this case, then the only logical, reasonable, and justifiable conclusion is that Dom must be released without delay. *See US v. Foy*, 1:21-cr-00108 (TSC) at ECF Doc. 45 at p. 9 (*citing Munchel*, 991 F.3d at 1283–84); *See also United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021), *judgment entered,* 844 Fed. Appx. 373 (D.C. Cir. 2021); *U.S. v. Mattis*, 963 F.3d 285 (2020); *U.S. v. Robinson, Order Setting Conditions of Release* (ECF Document No. 12 July 14, 2020); *United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999); *United States v Chimurenga*, 760 F.2d 400, 404 (2d. Cir. 1985); *United States v. Salerno*, 481 U.S. 739; *United States v.*

*Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Xulamn*, 84 F.3d 441 (DC Circuit 1996).

## POINT SIX

### THE DENIAL OF BAIL TO DEFENDANT DOMINIC PEZZOLA VIOLATES HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION AND NECESSITATES THAT BAIL BE GRANTED.

96.  As stated earlier, undersigned counsel, Martin Tankleff, was free on one million dollars bail, while awaiting trial for double murder.  The following cases, establish that individuals around the country who have faced equal or greater criminal charges, have been granted bail, released on their own recognizance or some other form of appropriate relief was established.  The denial of bail for Dominic is a denial of his Equal Protection Rights under the law.[17]

---

[17] Most Portland rioter have had their cases dismissed; Almost Half of Federal Cases Against Portland Rioters Have Been Dismissed; DA Vance Declines to Prosecute Protest Arrests; Charges against hundreds of NYC rioters, looters have been dropped; Most Riot, Looting Cases From Last Year Dropped by NYC DA's (*See* **Exhibit M**); https://www.theepochtimes.com/department-of-justice-treats-jan-6-detainees-with-double-standard-conservative-legal-activists_3891357.html; https://www.theepochtimes.com/jan-6-detainees-confined-23-hrs-day-risking-all-for-american-dream_3885912.html.  Further, Congresswoman Greene highlights that there has been a denial of Equal Protection across America based on similar arrests:

Consider that charges were dropped in at least 90 percent of cases where BLM and ANTIFA domestic terrorists were arrested over the last year. In Atlanta, charges were dropped in 37 cases of rioters arrested.[1] In Detroit, a judge dropped charges in 39 cases of rioters and looters. Altogether, 93 percent of cases have been dropped in Detroit.[2] In Orange County, California, assault charges were dropped for a leader of a BLM riot even though the prosecutor backed the police for making the arrest. In cities like Dallas and Philadelphia, up to 95 percent of citations were dropped or not prosecuted. In Houston, about 93 percent of citations were dropped. In Los Angeles, 93 percent of riot citations were not even filed by prosecutors.

(**Exhibit L** at pg.1)

| Name/Charge/State/ Year | Bail/Website |
|---|---|
| <ul><li>Elias Aaron Perez-Diaz</li><li>Multiple sex crimes</li><li>Wisconsin</li><li>2021</li></ul> | Perez-Diaz is currently being held at the Burleigh Morton Detention Center on a $1 million bond.<br><br>https://www.kfyrtv.com/2021/06/14/man-held-1-million-bond-molesting-raping-children-burleigh-county/ |
| <ul><li>Allen Weisselberg (Trump CFO)</li><li>Conspiracy, tax fraud, falsifying business records</li><li>Federal Court - New York</li><li>2021</li></ul> | Has been released on bail<br><br>https://www.scmp.com/news/world/united-states-canada/article/3139515/trump-organisation-charged-conspiracy-tax-fraud-and |
| <ul><li>Allison Mack</li><li>Sex trafficking, sex trafficking conspiracy, and conspiracy to commit forced labor</li><li>California</li><li>2018/2019</li></ul> | 5-million-dollar bail<br><br>https://www.cbc.ca/news/entertainment/allison-mack-sentenced-nxivm-1.6086143 |
| <ul><li>Lori Loughlin & Massimo Giannulli</li><li>Mail fraud</li><li>Federal Court - California</li><li>2019</li></ul> | One million dollars each<br><br>https://variety.com/2019/tv/news/lori-loughlin-bail-admissions-scandal-1203162547/ |
| <ul><li>Ryan Le-Nguyen</li></ul> | $100,000 bail |

| | |
|---|---|
| • Assault with intent to murder, assault with intent to do bodily harm and two firearms charges<br>• Michigan<br>• 2021 | https://www.usatoday.com/story/news/nation/2021/06/10/court-increases-bail-man-who-allegedly-shot-6-year-old-michigan/7637989002/ |
| • **Jonathan Rodriguez-Zamora**<br>• Shooting into an inhabited dwelling, carrying a concealed weapon, being a driver permitting a person to discharge a firearm from a vehicle and three counts of attempted murder<br>• California<br>• 2021 | 3-million-dollar bail<br><br>https://conandaily.com/2021/06/28/wilmington-los-angeless-jonathan-rodriguez-zamora-being-held-on-3-million-bail/ |
| • 11 individuals<br>• Charged with eight counts of unlawful possession of a firearm, unlawful possession of ammunition, use of body armor in commission of a crime, possession | $100,000 bail each<br><br>https://www.usatoday.com/story/news/nation/2021/07/04/massachusetts-95-standoff-what-rise-moor-moorish-sovereign/7858039002/ |

| | |
|---|---|
| of a high capacity magazine, improper storage of firearms in a vehicle and conspiracy to commit a crime<br>• Massachusetts<br>• 2021 | |
| • Adam Christian Johnson<br>• Three counts of entering or remaining in a restricted building without lawful authority, theft of government property and violent entry and disorderly conduct on Capitol grounds.<br>• 2021 | $25,000 bail<br><br>https://www.dailymail.co.uk/news/article-9136587/Florida-rioter-stole-Nancy-Pelosis-lectern-released-jail-posting-25K-bail.html |
| • Derek Chauvin<br>• Second-degree murder, third-degree murder, and second-degree manslaughter<br>• Minnesota<br>• 2020 | $ 1 million<br><br>https://bk-lawgroup.com/blog/derek-chauvin-released-on-bond-how-did-he-manage-to-pay-1m/ |

| | |
|---|---|
| • Sgt. Daniel Perry<br>• Murder, aggravated assault and deadly conduct for killing Air Force veteran and activist Garrett Foster<br>• Texas<br>• 2020 | $300,000<br><br>https://www.forbes.com/sites/nicholasreimann/2021/07/01/active-duty-sergeant-charged-with-murder-after-killing-black-lives-matter-protestor/?sh=1310f5cd5826 |
| • LaDonia Bogg<br>• Murder of her two-month-old baby<br>• D.C.<br>• 2021 | - Released on no cost bail<br>- https://www.nbcwashington.com/news/local/mother-of-missing-dc-baby-charged-with-murder/2672717/ |

97.    Below is a list of defendants charged in federal court in the District of Columbia related to crimes committed at the U.S. Capitol in Washington, D.C, on Wednesday, Jan. 6, 2021. Every case is being prosecuted by the U.S. Attorney's Office for the District of Columbia. Here are a few who have been granted bail:

1) **Antonio, Anthony Alexander** - <u>Charges:</u> Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, Violent Entry and Disorderly Conduct on Capitol Grounds, Obstruction of Law Enforcement During Civil Disorder, Obstruction of an Official Proceeding and Aiding and Abetting, Destruction of Government Property.
<u>Case #</u>: 21-mj-375.   Antonio remains released on bail.
https://www.justice.gov/usao-dc/capitol-breach-cases;

2) **Adam Christian Johnson.**   <u>Charges:</u> Three counts of entering or remaining in a restricted building without lawful authority, theft of government property and violent entry and disorderly conduct on Capitol grounds.   <u>Bail:</u> $25,000 https://abcnews.go.com/US/capitol-rioter-pictured-nancy-pelosis-lectern-released-bond/story?id=75186197; and

3) **Harris, Johnny -** <u>Charges:</u> Knowingly Entering or Remaining in any Restricted Building or Grounds without Lawful Authority, Knowingly, with Intent to Impede Government Business or Official Functions, Engaging in Disorderly Conduct on Capitol Grounds, Engaging in Disorderly or Disruptive Conduct on the Capitol Buildings or Grounds, and Parading, Demonstrating or Picketing in the Capitol Buildings.  <u>Case #:</u> 1:21-cr-274 <u>Bail:</u> Defendant remains on personal recognizance bond and has a status hearing set for 5/24/21 at 1 pm. https://www.justice.gov/usao-dc/capitol-breach-cases

98.   Other Defendants from Jan 6, 2021 who received personal recognizance bond:

| <u>Name:</u> | <u>Charges:</u> |
| --- | --- |
| <u>ADAMS, Jared Hunter</u> | Entering and Remaining in a Restricted Building; Disorderly and Disruptive Conduct in a Restricted Building; Violent Entry and Disorderly Conduct in a Capitol Building; Parading, Demonstrating, or Picketing in a Capitol Building |
| <u>ABUAL-RAGHEB, Rasha N.</u> | Entering and Remaining in a Restricted Building; Disorderly and Disruptive Conduct in a Restricted Building; Violent Entry and Disorderly Conduct in a Capitol Building; Parading, Demonstrating, or Picketing in a Capitol Building |
| <u>ADAMS, Daniel Page</u> | Civil Disorder; Obstruction of an Official Proceeding; Assaulting, Resisting or Impeding Certain Officers; Entering and Remaining in a Restricted Building or Grounds; Disorderly and Disruptive Conduct in a Restricted Building or Grounds; Disorderly Conduct in |

| | |
|---|---|
| | a Capitol Building; Impeding Passage Through the Capitol Grounds or Buildings; Parading, Demonstrating, or Picketing in a Capitol Building |
| ZINK, Ryan Scott | Obstruction of an Official Proceeding; Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority and engages in any act of physical violence against any person or property in any restricted building or grounds. |
| ALLAN, Tommy Frederick | Theft of Government Property; Entering and Remaining in a Restricted Building or Grounds; Disorderly and Disruptive Conduct in a Restricted Building or Grounds; Entering and Remaining on the Floor of Congress; Disorderly Conduct in a Capitol Building; Parading, Demonstrating, or Picketing in a Capitol Building |
| BALLESTEROS, Robert | Knowingly entering and remaining on restricted grounds without lawful authority and/or engaging in disorderly conduct within proximity to a restricted building to impede official functions |
| BARANYI, Thomas | Entering and Remaining in a Restricted Building; Disorderly and Disruptive Conduct in a Restricted Building or Grounds; Disorderly Conduct in a Capitol Building; Parading, Demonstrating, and Picketing in a Capitol Building |
| BARBER, Eric | Entering and Remaining in a Restricted Building or Grounds; Disorderly and Disruptive Conduct in a Restricted Building or Grounds; Disorderly Conduct in a Capitol Building or Grounds; Parading, Demonstrating, or Picketing in a Capitol Building |
| BARNARD, Richard Franklin | Unlawful Entry on Restricted Building or Grounds; Unlawful Entry on Restricted Building or Grounds; Violent entry and disorderly conduct on Capitol Grounds; Parading, Demonstrating or Picketing in a Capitol Building |
| BARNES, Joseph | Obstruction of an Official Proceeding; Entering and Remaining in a Restricted Building or Grounds; Disorderly and Disruptive Conduct in a Restricted Building or Grounds; Disorderly Conduct in a Capitol |

| | |
|---|---|
| | Building; Parading, Demonstrating, or Picketing in a Capitol Building |
| BARNETT, Richard | Obstruction of an Official Proceeding; Aiding and Abetting; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; Entering and Remaining in Certain Rooms in the Capitol Building; Disorderly Conduct in a Capitol Building; Parading, Demonstrating, or Picketing in a Capitol Building; Theft of Government Property |
| BINGERT, Craig Michael | Obstruction of an Official Proceeding and Aiding and Abetting; Assaulting, Resisting, or Impeding Certain Officers; Civil Disorder; Entering and Remaining in a Restricted Building or Grounds; Disorderly and Disruptive Conduct in a Restricted Building or Grounds; Engaging in Physical Violence in a Restricted Building or Grounds; Obstructing, or Impeding Passage Through or Within, the Grounds or Any of the Capitol Buildings:  Engaging in an Act of Physical Violence in the Grounds or Any of the Capitol Buildings |
| BLAIR, David Alan | Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon; Civil Disorder; Obstruction of an Official Proceeding; Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon; Unlawful Possession of a Dangerous Weapon on Capitol Grounds or Buildings; Disorderly Conduct on Grounds or in a Capitol Building; Act of Physical Violence in the Capitol Grounds or Buildings |
| CAPSEL, Matthew | Knowingly entering or remaining in any restricted building or grounds without lawful authority; and knowingly engages in any physical violence against any |

| | person or property in any restricted building or grounds; or attempts or conspires to do so; Forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while engaged in or on account of the performance of official duties; Committed or attempted to commit any act to obstruct, impede, or interfere with law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function. |
|---|---|

## POINT SEVEN

### THIS COUNT SHOULD NOT CONSIDER 18 USC 1512(C)(2) IN DETERMINING BOND.

98.  As for the most serious felony offenses that Dom is charged with, *inter alia*, conspiracy, and  one count of violating 18 U.S.C. 1512 (c)(2), that section does not apply to Dom's conduct.  Section 1512 is entitled "Tampering with a witness, victim, or an informant" which suggests that its subsections deal with judicial-type proceedings where a "witness, victim, or informant" is expected to testify. Under Section 1512, the full subsection (c) states as follows:

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

99. Dom did not destroy documents used in the proceeding.  His presence in at the Capitol did not directed to go after the vote counting was temporarily suspended does not constitute "corruptly…obstruct[ing], influenc[ing], or imped[ing]" the "official proceeding".   As such, the government cannot argue that Dom's and other the protestors' lawful presence outside the Capitol was intended to "influence" the vote counting inside.

100. Senator Schumer was not deemed to have been ". . . corruptly . . . influencing" an official proceeding or protesting outside of the U.S. Supreme Court building in March 2020 before an angry pro-abortion crowd, where he threatened Associate Justices Gorsuch and Kavanaugh while oral argument was taking place during an abortion case. [18]   FBI attorney, Kevin Clinesmith received mere probation, after being charged with violating this provision,

---

[18] *See* https://nlpc.org/2020/03/06/ethics-bar-complaints-filed-against-sen-schumer-on-supreme-court-threats/.

for altering a CIA email that was subsequentially used to improperly obtain a FISA warrant.[19]

101. Based on these above-mentioned examples, and the charges in this matter, as defense counsel for Dominic, we are duty bound to request discovery from the government to disclose the charging documents against "Code Pink" and other protestors who disrupted confirmation hearings ("official proceedings") for Justice Kavanaugh. *See* DOUG STANGLIN, CAROLINE SIMON, *Rise up, women!: Angry crowds flood Capitol Hill to protest Brett Kavanaugh nomination*, USA Today, available at https://www.usatoday.com/story/news/2018/09/28/brett-kavanaugh-hearing-protesters-christine-blasey-ford/1453524002/ (last visited April 23, 2021).

102. These individuals also were alleged to have blocked Congressional hallways and offices. *Id.* Discovery requests must be made to determine if those involved in "Code Pink" were charged with violating 18 U.S.C. 1512(c)(2) and their disposition.

103. At best, this is the only factor which weighs against Dom in favor of pretrial detention but is outweighed by all the other factors.

---

[19] *See also* https://nlpc.org/2021/01/29/miscarriage-of-justice-as-clinesmith-gets-slap-on-the-wrist/.

**POINT EIGHT**

**THE DECISION IN *UNITED STATES OF AMERICA V. TIMOTHY LOUIS HALE-CUSANELLI*[20] *SHOULD NOT IMPACT THIS CASE***

104. On July 7, 2021, the U.S. Court of Appeals for the District of Columbia Circuit issued its opinion in *U.S. v. Hale-Cusanelli*.  In the Court's decision, they concluded:

> a.  that the non-violent nature of Hale-Cusanelli's alleged offenses weighed "just slightly[21]" in favor of release, as did his lack of criminal history[22];
>
> b.  but that this was outweighed by factors including "overwhelming" evidence against him in the case, as well as a "well-documented history of racist and violent language"[23]; and
>
> c.  that he "has been generally engaged in hateful conduct, if not necessarily violent conduct."[24]

105. None of the above-noted factors, and the others that the court discussed weigh against Dominic.

---

[20] 2021 WL 2816245, *United States v. Hale-Cusanelli*, 21-3029, 2021 WL 2816245 (D.C. Cir. July 7, 2021).

[21] *Id.* at 3.

[22] *Id.*

[23] *Id.*

[24] *Id.*

106. Considering all of the above, there must be no delay in DOMINIC
PEZZOLA's release.

## VII.   CONCLUSION

**WHEREFORE**, for the foregoing reasons, and any/all others which may appear in our reply brief, at a full hearing on this matter, and any others this Court deems just and proper, defendant through counsel, respectfully requests that he be released on personal recognizance.

**FURTHERMORE**, if that request is denied, defendant requests as an alternative, that he be released on Third Party Custody and placed into the High Intensive Supervision Program of the Pretrial Services Agency conditioned on reasonable conditions including but not limited to electronic monitoring, work release and curfew.

**FINALLY**, if all forms of pre-trial release are denied, undersigned counsel requests that this Court issue an order granting defendant Dominic Pezzola the right to possess in his cell at the D.C. Jail (or any place where he is incarcerated) a laptop[25] that contains:

a.  All written discovery provided by the Government;

b.  All audio and video discovery provided by the government;

---

[25] In the alternative to a laptop, another form of an electronic device, such as a tablet whereby Dominic can review all the discovery, including audio/video and documentary evidence, and email his attorneys.

c.  The ability to email and receive emails from his attorneys;

d.  The ability to generate notes, documents, and other relevant materials to aid

in his own defense; and

e.  A guarantee that no one shall access the laptop in an effort to gain access to

attorney client privileged materials.

Dated:  July 9, 2021

*Martin H. Tankleff*

MARTIN H. TANKLEFF, ESQ.
STEVEN A. METCALF, ESQ.
**Metcalf & Metcalf, P.C.**
*Attorneys for Defendant*
99 Park Avenue, 25th Floor
New York, NY 10016
*Phone* 646.253.0514
*Fax* 646.219.2012
*mtankleff@metcalflawnyc.com*
*metcalflawnyc@gmail.com*